RAILWAY LABOR EXECUTIVES'
ASSOCIATION, Appellee,

v.

PITTSBURGH & LAKE ERIE
RAILROAD CO., Appellant,

Interstate Commerce
Commission, Intervenor.

No. 87–3797.

United States Court of Appeals,
Third Circuit.

Argued Jan. 8, 1988.

Decided April 8, 1988.

John O'B. Clarke, Jr. (argued), Highsaw & Mahoney, P.C. Washington, D.C., Stanley W. Greenfield, Graydon R. Brewer, Greenfield and Associates, Pittsburgh, Pa., for appellee.

Richard L. Wyatt, Jr. (argued), Ronald M. Johnson, Mary K. Qualiana, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., G. Edward Yurcon, Vice President—Law, The Pittsburgh & Lake Erie R. Co., Pittsburgh, Pa., for appellants.

Robert S. Burk, General Counsel, Henri F. Rush, Deputy General Counsel, John J. McCarthy, Jr., Deputy Associate General Counsel, Clyde J. Hart, Jr. (argued), Interstate Commerce Com'n, Washington, D.C., for intervenor.

Stephen M. Olson (argued), David J. Strasser, Kirkpatrick & Lockhart, Pittsburgh, Pa., for amicus curiae—P & LE Railco, Inc.

Ralph J. Moore, Jr., Richard T. Conway, Shea & Gardner, David P. Lee, Vice Chairman & General Counsel, Nat. Ry. Labor Conference, Washington, D.C., for amicus curiae Nat. Ry. Labor Conference.

Before BECKER, HUTCHINSON and COWEN, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

In 1926, Congress enacted the Railway Labor Act ("RLA"), in order to prevent railroad strikes from crippling interstate commerce. *See* ch. 347, 44 Stat. 577 (1926), now codified as amended at 45 U.S.C. §§ 151–188 (1982); *Detroit & Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969). The RLA prohibits a railroad employer from changing "rates of pay, rules, or working conditions" while a dispute concerning changes in a collective bargaining agreement is being negotiated. 45 U.S.C. § 156 (1982).

In 1887, Congress enacted the Interstate Commerce Act ("ICA"), beginning almost a century of comprehensive regulation of interstate transportation in this country. *See* ch. 104, 24 Stat. 379 (1887). After successive expansions of the scope of the ICA, *see, e.g.,* Transportation Act of 1920, ch. 91, 41 Stat. 456 (1920); Transportation Act of 1940, ch. 722, 54 Stat. 898 (1940), the trend of increasing regulation was broken in 1976 and again in 1980, when Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31, and the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895. Most pertinent to this case, these Acts drastically reduced the amount of federal involvement in rail mergers and acquisitions, in an effort to implement a congressional policy favoring expedited approvals of sales of railroads, particularly railroads that are in danger of failing. *See generally* H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Admin.News 3978, 4110. Under this legislation, the Interstate Commerce Commission ("ICC" or "Commission") has the express power to impose so-called "labor protective" conditions on a sale. *See, e.g.,* 49 U.S.C. §§ 10901(e), 11347 (1985).

This case presents an important question of first impression at the intersection of these two statutes: whether a railroad has a duty to refrain from completing a sale of its rail assets pending bargaining under the RLA over the effects of that sale on the employees' working conditions, when the ICC has granted expedited approval to the (proposed) sale without imposition of labor protective conditions.

The case arises in the context of an appeal from an order granting summary judgment for the plaintiff, Railway Labor Executives Association ("RLEA" or "the unions"), and granting a permanent injunction against the defendant, Pittsburgh & Lake Erie Railroad ("P & LE" or "the railroad"). Plaintiff RLEA is an unincorporated association of the chief executive officers of nineteen railway labor unions, including all fourteen unions that represent P & LE's employees. The district court, in granting summary judgment, ordered the railroad to comply with the "major dispute" resolution procedures of the Railway Labor Act. Moreover, in spite of the fact that the ICC had already approved the proposed

sale, the court enjoined the railroad from proceeding with the sale of its assets until those procedures had been exhausted, unless the sale agreement included provisions guaranteeing that the employees' current working conditions, including rates of pay, be maintained (the "status quo injunction").

■ We have little difficulty in concluding that the railroad's decision to sell its rail assets and the consequential elimination of a substantial number of rail jobs presents a so-called "major dispute" under the Railway Labor Act and, therefore, that the railroad must bargain over the effects of that decision. Under the RLA, the railroad must maintain the status quo, including the existence of current jobs and rates of pay, while the bargaining process is pending. We have much greater difficulty with the question of the effect of the ICA on this duty, for there is a strong tension between the policies of the two Acts and, unfortunately, Congress has stranded the courts at the crossing. P & LE contends that the policies expressed in the ICA, particularly as applied by the Interstate Commerce Commission in this case, should relieve the railroad of any obligations it has under the RLA. The unions, however, argue that the status quo injunction does not conflict with the Commission's approval and is, in fact, mandated by the RLA.

■ We confess to finding the solution proposed by each party to be unsatisfactory. Dominating our thinking, however, is a reluctance to impinge on a congressional statutory mandate (the RLA) without a clear congressional authorization (and we find none), or to find an implied repeal of the requirements of the venerable Railway Labor Act without an unavoidable conflict between the mandates of the two statutes (and such a conflict is not ineluctable). *See Watt v. Alaska*, 451 U.S. 259, 266–67, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981). We are particularly reluctant to find such a repeal here, where Congress has so recently addressed itself to deregulating the rail industry, yet has not chosen to relieve management of any of the onerous burdens imposed by the RLA. Moreover, because the Commission's approval of the transaction was merely permissive, we do not view an injunction against the sale as an attack on the ICC's order; and because the approval stemmed from a process in which labor's interests are only one of fifteen factors considered by the Commission, we do not believe that Congress intended that rail labor rely solely on the ICC for protection, to the exclusion of labor's rights under the RLA. For these reasons, we conclude that Congress did not intend the Commission's approval of the transaction without the imposition of substantive labor protective conditions to relieve the railroad of its obligation to comply with the exclusive, congressionally-mandated RLA dispute resolution procedures.

We recognize that, arguably, in our effort to avoid impinging on the RLA, our decision instead has the effect of contravening the mandate of the ICA. We do not believe that it does but, if we are mistaken, we still believe we have reached the correct result: plainly, if either a grant *or* a denial of the status quo injunction will conflict with a statutory mandate, we must reconcile the two statutes as much as possible and attempt to reach a result that will produce the minimum possible conflict with congressional intent. As we will demonstrate, any conflict with the ICA produced by the order to maintain the status quo is substantially less than the conflict with the RLA that would result from a denial of the injunction. We therefore choose the path of least destruction, and the one we deem most consistent with Supreme Court precedent. If Congress intended a different result—and we concede that a different result might well be desirable—it should have said so. We therefore will affirm the district court's order.

## I. STATUTORY BACKGROUND

### A. *The Railway Labor Act*

The Railway Labor Act is the product of a joint effort by labor and management representatives to channel labor disputes into constructive resolution procedures as a means of avoiding interruptions to commerce and preventing strikes. *See Detroit & Toledo Shore Line R.R. v. United*

*Transp. Union,* 396 U.S. 142, 148–49 & n. 13, 90 S.Ct. 294, 298–99 & n. 13, 24 L.Ed.2d 325 (1969). There are two types of disputes that can arise under the RLA—"major" disputes, which involve efforts to form or proposals to change collective bargaining agreements, and "minor" disputes, which require the interpretation or application of a specific provision of a collective bargaining agreement.[1] *See Detroit & Toledo Shore Line,* 396 U.S. at 148, 90 S.Ct. at 298; *Elgin, J. & E. Ry. v. Burley,* 325 U.S. 711, 722–28, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945); *International Ass'n of Machinists v. Northwest Airlines,* 673 F.2d 700, 705–06 (3d Cir.1982).

Major disputes "look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past"; in minor disputes, "the claim is to rights accrued, not merely to have new ones created for the future." *Elgin, J. & E. Ry.,* 325 U.S. at 723, 65 S.Ct. at 1290. Minor disputes are resolved through a formal grievance process that culminates in binding arbitration performed by the National Railroad Adjustment Board. RLA § 3, 45 U.S.C. § 153. Major disputes, on the other hand, are channeled into an exhaustive bargaining process, designed to force the parties into serious negotiation and to encourage compromise. RLA § 6, 45 U.S.C. § 156; *see Detroit & Toledo Shore Line,* 396 U.S. at 148–50, 90 S.Ct. at 298–99.

When a minor dispute arises, the parties are not precluded from changing the status quo; management is free to implement its interpretation of the agreement, unless and until the interpretation is held invalid by the Adjustment Board. *See, e.g., United Transp. Union v. Penn Cent. Transp. Co.,* 505 F.2d 542, 545 (3d Cir.1974); *Maine Cent. R.R. v. United Transp. Union,* 787 F.2d 780, 781 (1st Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986); *cf. Local 553, Transp. Workers Union v. Eastern Air Lines,* 695 F.2d 668, 675 (2d Cir. (1983)

(status quo injunction is available, pending arbitration of a minor dispute, only when necessary to prevent arbitration from becoming meaningless).

Major disputes, however, trigger a status quo obligation. Once a party proposes a change in the collective bargaining agreement, that party is required to serve notice of its intentions (a "section 6 notice"), and both parties must maintain the status quo until the RLA bargaining processes have been exhausted. *See Detroit & Toledo Shore Line,* 396 U.S. at 150–53, 90 S.Ct. at 299–301; RLA § 6, 45 U.S.C. § 156 ("rates of pay, rules, or working conditions shall not be altered by the carrier until [bargaining and mediation have been exhausted]"); RLA § 2 Seventh, 45 U.S.C. § 152. Those processes have been described by the Supreme Court as "almost interminable." 396 U.S. at 149, 90 S.Ct. at 299. They operate as follows:

A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10.

*Ry.,* 325 U.S. at 723–24, 65 S.Ct. at 1289–90; *Local 553, Transport Workers Union v. Eastern Air Lines,* 695 F.2d 668, 673 (2d Cir.1983).

---

**1.** The terms "minor" and "major" disputes do not appear in the statute itself. Rather, they are time-honored judicially-created nomenclature for the statutory categories. *See Elgin, J. & E.*

*Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969).

In the end, however, the process is merely conciliatory. Unlike minor disputes, which parties must submit to binding arbitration, major disputes will be resolved, through a series of seemingly endless negotiations, by the parties themselves, or will not be resolved at all; agreements will not be imposed upon the parties. Once the process is finally exhausted and it becomes clear that the parties will not reach agreement, the parties are released from their status quo obligations, and are free to resort to "self-help"—management to implement its proposed changes, and the workers to strike. *Id.* at 378–80, 89 S.Ct. at 1115–16.

### B. *The Interstate Commerce Act and the ICC*

 The Interstate Commerce Act gives the ICC exclusive jurisdiction to approve and to regulate acquisitions of rail lines. *See, e.g.*, 49 U.S.C. §§ 10901(a), 11343(a) (Supp.III 1985); *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318–20, 101 S.Ct. 1124, 1130–32, 67 L.Ed.2d 258 (1981). Section 10901 of the Act governs the acquisition of rail lines by non-carriers. Such transactions may proceed only "if the Commission finds that the present or future public convenience and necessity require or permit the [acquisition] and operation of the railroad line." 49 U.S.C. § 10901(a). The ICC has discretion to condition its approval of a § 10901 transaction on the provision of "a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected [by the transaction]." § 10901(e). However, pursuant to § 10505, the Commission will exempt any transaction from regulation under § 10901 when it finds that such regulation "is not necessary to carry out" national rail transportation policy, and is "not needed to protect ship-

pers from the abuse of market power." 49 U.S.C. § 10505(a).

In a 1985 rulemaking proceeding, the Commission decided to exempt from regulation under § 10901 the entire class of transactions involving acquisitions by non-carriers. *See Ex Parte 392* (Sub. No. 1), *Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. 10901*, 1 I.C.C.2d 810 (1985) [hereinafter *Ex Parte 392*], *review denied mem. sub nom. Illinois Commerce Comm'n v. ICC*, 817 F.2d 145 (D.C.Cir.1987). Under *Ex Parte 392*, an exemption becomes effective and a transaction is deemed approved after seven days following the filing of a notice by the acquiring entity, 49 C.F.R. § 1150.32(b); 1 I.C.C.2d at 820, unless a petition to revoke the exemption has been filed and granted or the transaction is stayed by the Commission. *See* 49 U.S.C. § 10505(d); 49 C.F.R. § 1150.34; 1 I.C.C. 2d at 815.

### II. FACTS AND PROCEDURAL HISTORY

#### A. *The Sale and the Requests to Bargain*

P & LE owns and operates a railroad in western Pennsylvania and eastern Ohio. The railroad has suffered heavy financial losses over the past four years, and has accumulated a substantial amount of debt.[2] Unable to stem its losses and in an effort to avoid a bankruptcy proceeding, P & LE sought a buyer for its entire rail operations. On July 8, 1987 it entered into an agreement to sell all of its assets (except for some minor real estate holdings and 6,000 rail cars) for slightly more than $70 million to P & LE Railco, Inc. ("Railco"), a newly-formed subsidiary of the Chicago West Pullman Corporation created for the purpose of acquiring P & LE's assets.[3] After the sale, Railco plans to operate P &

---

2. P & LE claims losses of $60 million over the past five years, and accumulated debt of $124 million as of September, 1987. RLEA has not contested these figures.

3. Railco is actually owned by the Chicago West Pullman Transportation Corporation, which operates four short line railroads, and which in turn is owned by the Chicago West Pullman Corporation.

LE's rail lines, and P & LE expects to cease operation as a rail carrier.

On July 30, 1987 P & LE informed its unions of the planned sale. Although P & LE provided no details, it was apparent that Railco intended to operate with a substantially reduced workforce, and that as many as 500 of P & LE's 750 rail employees would lose their jobs. Beginning on August 7, P & LE's various unions requested that the railroad serve formal notices of its intentions on the unions, pursuant to section 6 of the RLA, 45 U.S.C. § 156, and that the railroad commence formal RLA bargaining over the effects of the proposed transaction on the employees. P & LE refused, claiming that RLA bargaining was not required because the transaction would be subject to the exclusive jurisdiction of the ICC, pursuant to the Interstate Commerce Act.

Given P & LE's refusal, RLEA filed a complaint on August 19, 1987 in the District Court for the Western District of Pennsylvania, seeking an order requiring the railroad to exhaust RLA bargaining procedures before proceeding with the sale. At about the same time, the unions began to serve section 6 notices, proposing substantial labor protection, including the preservation of all current jobs.

### B. *The ICC's Approval*

On September 19, 1987, pursuant to 49 C.F.R. §§ 1150.31.34,[4] Railco filed a "notice of exemption" with the ICC, seeking ex-

emption from the regulatory requirements of 49 U.S.C. § 10901.[5] RLEA and other interested parties filed a petition to reject the exemption, and requested a stay of the transaction. The ICC denied the request for a stay on September 25, declaring that the transaction was governed by § 10901 and that RLEA had not shown a sufficient likelihood of prevailing on the merits to justify imposing labor protection prior to consummation of the sale. *P & LE Railco, Inc.—Exemption Acquisition and Operation—Lines of the Pittsburgh and Lake Erie Railroad Co. and the Youngstown and Southern Ry. Co.*, ICC Finance Docket Nos. 31121, 31122, 31126 (Sept. 25, 1987).[6]

In denying the request, the Commission explained that a stay would delay the transition between P & LE's and Railco's service, thereby possibly causing substantial harm to the parties, as well as to the shippers, employees and communities on the line. A stay of the transaction, the ICC further found, would force P & LE to suffer continued financial losses, and given those losses, "[i]t is unclear whether or how long it can continue operations." *Id.* at 4. The Commission, however, did order P & LE to maintain its corporate existence until the Commission completed review of any petitions for revocation. ICC Finance Docket Nos. 31121, 31122 (Oct. 13, 1987) (denial of petition for reconsideration). RLEA filed a petition for revocation on October 2, 1987, which is still pending.

---

**4.** Sections 1150.31.34 of 49 C.F.R. codify the ICC's 1985 rulemaking in *Ex Parte 392.*

**5.** As discussed above, section 10901 applies only to purchases by non-carriers, and not by existing carriers. The ICC has repeatedly ruled that subsidiaries of operating railroads that have been specifically formed to acquire marginal rail lines will be considered non-carriers for purposes of the acquisition, and these rulings have been upheld as within the ICC's discretion by the courts, at least as long as the subsidiary is financially independent of its parent corporation. *See RLEA v. ICC,* 819 F.2d 1172–73 (D.C. Cir.1987); *RLEA v. United States,* 791 F.2d 994, 1005–06 (2d Cir.1986). The ability to proceed under § 10901 as a non-carrier, rather than under the analogous provision for acquisitions by carriers, 49 U.S.C. §§ 11343–11344, is quite significant, because labor protective provisions

are discretionary in transactions involving a non-carrier, but mandatory in transactions between the carriers. *Compare* § 10901(e) ("The Commission *may* require [labor protection]") (emphasis added) *with* § 11347 (the "Commission *shall* require" such protection in transactions approved under § 11344) (emphasis added). The decision to proceed under § 10901 is not challenged on this appeal. Such a challenge could only be made by a petition for review of an ICC order. *See* 28 U.S.C. §§ 2321(a), 2342(5).

**6.** The Commission did note, however, that, "in the unlikely event that the Commission imposes labor protection in a future exemption revocation proceeding," such a remedy could be imposed post-consummation by revoking the exemption. ICC Finance Docket Nos. 31121, 31122, 31126, at 3 (Sept. 25, 1987).

## C. *The Strike and the Status Quo*

On September 15, 1987, prior to Railco's filing of its notice of exemption with the ICC, the unions commenced a strike to force P & LE to comply with its duty to bargain under the RLA. P & LE then filed a counterclaim in the district court, seeking to enjoin the strike. The district court first denied a temporary restraining order, holding itself barred by the anti-injunction strictures of the Norris–LaGuardia Act ("NLGA"), 29 U.S.C. § 108 (1982), but then reversed itself in the wake of the ICC's refusal to stay the transaction. The district court held the strike to be an illegal attempt to force P & LE to provide labor protection in connection with the sale, in contravention of the ICC's approval of the sale without labor protective provisions. Finding that the strike frustrated P & LE's efforts to complete the sale, the court enjoined the strike, holding that the ICC's exclusive jurisdiction over the transaction displaced the anti-injunction provisions of the NLGA. This court, however, summarily reversed on October 26, holding that "[t]he ICC's authority to consider the incidental effect of the transaction on labor and its discretionary authority to require provisions that protect employees" could not override the "strong national policy embodied in the [NLGA]." *RLEA v. P & LE,* 831 F.2d 1231, 1236 (3d Cir.1987).[7] We therefore remanded the case for further proceedings. *Id.* at 1237.

On November 24, following remand, the district court granted summary judgment for RLEA 677 F.Supp. 830, holding that the instant dispute was a "major" dispute under the RLA, and that therefore P & LE must bargain over the effects on the employees of the proposed sale before implementing the transaction. The court rejected P & LE's argument that the ICC's exclusive jurisdiction over rail carrier transactions preempted the railroad's obligations under the RLA. The court held the RLA applicable, and issued a status quo injunction, enjoining the railroad from "altering the rates of pay, rules and working conditions in existence at the time [the unions served their] section 6 notices." J.A. 369. *See* 45 U.S.C. § 156. The court further made clear that the sale could not be consummated unless provisions were made for the maintenance of the status quo, i.e., maintenance of the employees' current jobs and rates of pay. J.A. 369–70.

P & LE filed an emergency motion with this court, seeking summary reversal of the injunction order. We denied the motion on December 10, 1987, however we expedited the appeal.[8]

7. Following our October 26 opinion the unions did not resume their strike. However, the railroad believes that the strike will be renewed if any action is taken to consummate the sale. Brief of Appellant at 19. Although not made explicit by P & LE in this appeal, the railroad argued quite strongly in the prior appeal that the effect of the strike would likely be to block the consummation of the sale. *See* Memorandum of the P & LE R.R. Co. in Opposition to Emergency Motion at 2, *RLEA v. P & LE,* 831 F.2d 1231 (3d Cir.1987) ("rail labor could simply block the ICC-authorized transaction by calling a strike"); *id.* at 18, 29; *see also* P & LE's Verified Counterclaim ¶ 13, J.A. 11, 14 ("Unless restrained, the strike could also interfere with and preclude P & LE from finalizing the sale of its assets to Railco."); Affidavit of Gordon E. Neuenschwander, President of P & LE ¶ 12, J.A. 20, 22 ("A strike will damage P & LE's ability to follow through on the sale of its assets to P & LE Railco. If this sale is not consummated, it is unlikely that the P & LE could find another buyer willing to agree to the same terms and conditions of sale.").

8. Subsequent to oral argument, RLEA informed us by letter memorandum of developments that potentially could moot this appeal. According to a letter from Richard L. Wyatt, Jr., counsel for P & LE, to John O'B. Clarke, Jr., counsel for RLEA, P & LE claims that its agreement to sell its assets to Railco has been terminated and that P & LE is no longer obligated to consummate the sale, although P & LE still is actively seeking a purchaser for its rail assets. However, according to the letter, Railco takes the position that the agreement is still viable, and Railco is seeking to enforce the agreement in the United States District Court for the Southern District of Ohio. Because the proposed sale to Railco has merely been sidetracked, rather than derailed, because P & LE still is actively seeking to sell its rail assets and its unions still are actively asserting their right to bargain over the effects of any sale on their members' working conditions, and because we believe that the ICC, under its streamlined approval process initiated by *Ex Parte 392,* will readily grant an exemption to any viable purchaser of the struggling P & LE's lines, we believe that we are still faced with a

## III. THE DUTY TO BARGAIN

### A. *Does The Case Involve A Major Dispute?*

■ P & LE argues, albeit weakly, that its dispute with RLEA is not a "major" dispute. *See* Brief of Appellant at 72; Reply Brief of Appellant at 4–10. Apparently, P & LE is contending that because it always has the "right" to go out of business, and because the sale of the railroad would not violate the collective bargaining agreements, no "change" in the agreement has been proposed and thus no major dispute has arisen. The argument, however, misses the mark.

The dispute in this case is not about the decision to sell the P & LE's rail lines; it is about the effects of that decision on the employees of the railroad.[9] P & LE does not deny that the sale, as it is now structured, will lead to a substantial reduction in the workforce on the rail line. This loss of jobs by possibly two-thirds of the employees clearly would require a "change in agreements affecting rates of pay, rules, or working conditions." RLA § 6, 45 U.S.C. § 156. Whenever a party intends to implement such a change, the RLA requires that the party submit to the major dispute resolution process and not alter the status quo. *Id.*[10]

In the leading case of *Detroit & Toledo Shore Line*, the railroad notified its union that it intended to require certain employees to report to work at Trenton, Michigan instead of Toledo, Ohio. An Adjustment Board had already determined that the collective bargaining agreement would not prohibit such "outlying work assignments."

396 U.S. at 145–46, 90 S.Ct. at 296–97. Yet, when the union served a section 6 notice on the employer proposing to amend the agreement to forbid all outlying assignments, the Supreme Court held that a major dispute had arisen and that the railroad was prohibited from implementing the new assignments until after the parties had exhausted the RLA bargaining process, even though implementation of these assignments would not violate the existing agreement. *Id.* at 148–55, 90 S.Ct. at 298–302.

The Court explained that "the status quo extends to those actual, objective working conditions out of which the dispute arose." *Id.* at 153, 90 S.Ct. at 301. Because the "actual working conditions" at the time the dispute arose did not include outlying assignments, "[i]t was therefore incumbent upon the railroad by virtue of § 6 to refrain from making outlying assignments ..., regardless of the fact that the railroad was not precluded from making these assignments under the existing agreement." *Id.* at 154, 90 S.Ct. at 301.

P & LE has similarly proposed action which might not *violate* its agreements, yet it plainly would *change* the nature of those agreements. Moreover, even if that were not the case, P & LE's unions have proposed substantial changes to the agreements, and therefore P & LE must "preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Id.* at 153, 90 S.Ct. at 301. Such objective conditions plainly include the very existence of the workers' jobs.

---

live controversy over RLEA's entitlement to a bargaining order and status quo injunction. That is, this case is not moot because each party continues to retain a "legally cognizable interest in the outcome," thus insuring a "sufficient functional adversity" between the parties to justify the invocation of our jurisdiction. *International Bhd. of Boilermakers v. Kelly*, 815 F.2d 912, 915 (3d Cir.1987) (citations omitted).

**9.** There is no argument about whether the collective bargaining agreement itself permits or prohibits the proposed sale. If *that* were the crux of the dispute, then this case would require

an interpretation of the agreement, and would thus be a minor dispute, to be resolved by arbitration. P & LE's agreements with its unions, however, do not appear to contemplate this type of transaction, and thus neither expressly permit nor prohibit the sale.

**10.** Moreover, the dispute is a major dispute under the RLA because it "look[s] to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Elgin, J. & E. Ry.*, 325 U.S. at 723, 65 S.Ct. at 1290.

## B. The Right to Go Out of Business And The Duty to Bargain Over Effects

P & LE makes a more powerful argument that, no matter how this dispute is categorized, an employer has no duty to bargain over its decision to go out of business, for such a decision is a quintessential management prerogative, hence it cannot be enjoined. The argument rests primarily on the Supreme Court's landmark decision in *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981).

In *First National Maintenance,* the Court held that an employer's decision to shut down part of its business is a management prerogative about which the employer need not bargain with its employees, even though the decision would lead directly to the loss of employee jobs. In words that P & LE claims are applicable here, the Court explained that "management may have great need for speed, flexibility, and secrecy" in implementing its decision to close, and such need could be frustrated by imposing a duty to bargain over the decision. 452 U.S. at 682–83, 101 S.Ct. at 2582–83.

However, the Court also made clear that the union need not be left out in the cold; "the union must be given a significant opportunity to bargain about ... matters of job security as part of the 'effects' bargaining mandated by § 8(a)(5) [of the National Labor Relations Act ('NLRA')]." *Id.* at 681, 101 S.Ct. at 2582 (citations omitted); *see also id.* at 677 n. 15, 101 S.Ct. at 2580 n. 15. Such effects bargaining "must be conducted in a meaningful manner and at a meaningful time," and the Court recognized that, "by pursuing such bargaining rights, [a union] may achieve valuable concessions from an employer engaged in a partial closing." *Id.* at 682, 101 S.Ct. at 2582. The Court further explained that the union, through its control over the effects, "indirectly may ensure that the decision itself is deliberately considered." *Id.*

P & LE insists that it stands ready to bargain over the effects of the sale,[11] and that it will continue to so bargain even after the sale is completed. However, it argues, the consequence of the injunction against sale, pending bargaining, is that the union can now impose its influence not only on the effects of the decision, an issue in which it has a legitimate interest, but also on the very decision to sell, an exclusive management prerogative. This, P & LE maintains, gives the union a veto power over the sale, a result prohibited by *First National Maintenance.*

We concede that P & LE has made a powerful argument, for imposing the RLA requirements in this situation may well have the practical effect of torpedoing the sale. However, we need not decide whether P & LE's offer of post-sale bargaining could possibly constitute bargaining "in a meaningful manner and at a meaningful time," for, although we would like to hold that the cumbersome procedures of the RLA are inapplicable here, we are constrained by the law to conclude that the RLA applies, and that more is required than mere post-sale bargaining.

We note first that it is far from clear whether *First National Maintenance,* a case interpreting the NLRA, is applicable to a railroad employer. It is by now almost axiomatic that NLRA and RLA cases are not freely interchangeable, as the two statutes have distinctly different histories and different approaches to the problem of labor-management relations. *See, e.g., Brotherhood of R.R. Trainmen,* 394 U.S. at 383–84, 89 S.Ct. at 1117–19; *Air Line Pilots Ass'n v. United Air Lines,* 802 F.2d 886, 897–98 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987); *Ruby v. American Airlines,* 323 F.2d 248, 256 (2d Cir.1963) (Friendly, J.), *cert. denied,* 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964). This is not to say that NLRA *principles* are not useful in the railroad context, but only that they cannot be applied blindly. *See, e.g., Brotherhood*

---

11. In fact, P & LE insists that such bargaining has already taken place, through a series of meetings with union representatives in September and October, held "without prejudice to [the railroad's] position that it had no mandatory duty to engage in effects bargaining under Section 6 of the Railway Labor Act." Brief of Appellant at 16.

*of R.R. Trainmen,* 394 U.S. at 383, 391, 89 S.Ct. at 1117, 1122.

In *First National Maintenance,* the Court itself recognized that its decision might not apply in the RLA context, and that, in fact, it might conflict with RLA precedent. The Court felt bound to distinguish an earlier RLA case, *Order of Railroad Telegraphers v. Chicago & North Western Railway Co.,* 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960), which could be read to hold that a union has the right to bargain over the effects on job security of certain traditionally exclusive management decisions. In doing so, the Court noted that the earlier decision had

> rested on the particular aims of the Railway Labor Act and national transportation policy. *See* 362 U.S., at 336–338, 80 S.Ct., at 764–765. The mandatory scope of bargaining under the Railway Labor Act and the extent of the prohibition against injunctive relief contained in Norris–LaGuardia are not coextensive with the National Labor Relations Act and the Board's jurisdiction over unfair labor practices. *See Chicago & N.W.R. Co. v. Transportation Union,* 402 U.S. 570, 579, n. 11, 91 S.Ct. 1731, 1736, n. 11, 29 L.Ed.2d 187 (1971) ("parallels between the duty to bargain in good faith and the duty to exert every reasonable effort, like all parallels between the NLRA and the Railway Labor Act, should be drawn with the utmost care and with full awareness of the differences between the statutory schemes").

*First Nat'l Maintenance,* 452 U.S. at 686 n. 23, 101 S.Ct. at 2585 n. 23.

We need not decide, however, whether *First National Maintenance* actually applies to railway employers, because we conclude that, whether the case applies or not, the railroad has a duty to bargain over the effects of the transaction prior to implementing its unilateral decision to sell its rail assets.

If *First National Maintenance* does not apply, then, because the instant dispute is a major dispute, *see supra* Part III.A., under the RLA the union was entitled to a status quo injunction, which of course requires the railroad to maintain in existence the workers' actual jobs.

We find support for this position in *Order of Railroad Telegraphers.* There, the railroad proposed to abandon certain stations which it no longer found economical to maintain. When the union served section 6 notices, proposing to amend the collective bargaining agreement to prohibit the abolition of any jobs then in existence, the railroad refused to bargain. The union struck in protest, and the railroad sought an anti-strike injunction, claiming that the union was striking over a non-bargainable issue. The Supreme Court disagreed.

■ "We cannot agree," the Court said, "that the union's effort to negotiate about the job security of its members 'represents an attempt to usurp [a] legitimate managerial prerogative in the exercise of business judgment with respect to the most economical and efficient conduct of its operations.'" 362 U.S. at 336, 80 S.Ct. at 765 (citation omitted). We read this (and apparently so did the Supreme Court in *First National Maintenance*) to reject implicitly the idea that a subject is off-limits to RLA bargaining merely because it could be labeled a "managerial prerogative." To the contrary, when a decision affects the very existence of the workers' jobs, the RLA mandates bargaining.[12]

---

**12.** In *Telegraphers,* the Court explained that

> It is too late now to argue that employees can have no collective voice to influence railroads to act in a way that will preserve the interests of the employees as well as the interests of the railroad and the public at large.

*Order of R.R. Telegraphers,* 362 U.S. at 338, 80 S.Ct. at 765. It seems to us that, if workers can insist on bargaining to preserve jobs when the railroad proposes to abandon certain stations, they similarly can demand bargaining when the railroad proposes to abandon its ownership of an entire line. *See also id.* at 339, 80 S.Ct. at 766 ("the union's effort to negotiate its controversy with the railroad was in obedience to the Act's command that employees *as well as railroads* exert every reasonable effort to settle all disputes 'concerning rates of pay, rules, and working conditions.' [RLA § 2 First, 45 U.S.C. § 152 First.]") (emphasis added); 362 U.S. at 341, 80 S.Ct. at 767 ("it is impossible to classify as a minor dispute this dispute relating to a major change, affecting jobs, in an existing collective bargaining agreement, rather than to

We recognize, of course, that the decision to abandon an entire line of business could be viewed as qualitatively different from the decision to abandon several stations, the former being particularly appropriate for managerial discretion. We nevertheless find *Telegraphers* helpful, for just as an employer surely has a "right to terminate his entire business," *see First Nat'l Maintenance*, 452 U.S. at 677, 101 S.Ct. at 2580 (quoting *Textile Workers v. Darlington Co.*, 380 U.S. 263, 268, 85 S.Ct. 994, 998, 13 L.Ed.2d 827 (1965)), an employer similarly has a "right" to abandon operations at certain locations of its business, in effect a decision to close down certain parts of the business. Yet in spite of the uniquely managerial nature of the decision, the Supreme Court has plainly countenanced RLA bargaining over the effects of the decision. We believe the Court would extend *Telegraphers* to a sale such as this.

The Fifth Circuit has read *Telegraphers* similarly. In *United Industrial Workers v. Board of Trustees of Galveston Wharves*, 351 F.2d 183 (5th Cir.1965), the court held that a carrier's decision to lease a grain elevator to a third party and consequently discharge employees who work on that elevator constitutes a change in working conditions, triggering a major dispute. Thus, under section 6 of the RLA, the carrier was required to bargain with the union *prior* to implementing the lease. "We may assume that an employer has the legal right to go out of business," the court stated, "[b]ut under the Railway Labor Act when he does so during the term of the agreement, it is such a change in 'working conditions' that under § 6 and § 2 Seventh, he must give notice." *Id.* at 190. Once notice is given, the court held, "the procedure of § 6 [is] set in train," giving the

union "a right to bargain." *Id.*[13] *Cf. In re Michigan Interstate Ry. Co.*, 34 B.R. 220, 226–27 (E.D.Mich.1983) (state-mandated reduction in rail service from over 300 route miles to approximately 47 miles, which led to a concomitant reduction in workforce from 384 union employees to 33 union employees, produced a change in working conditions and therefore a major dispute, and was therefore a unilateral change prohibited by section 6).

■ Alternatively, even if *First National Maintenance* does apply in the railway context, it simply cannot be read in a vacuum. We believe that it must be read in the context of the railroad's RLA obligations. We agree, and the union apparently concedes, that the railroad has no obligation to bargain over the underlying decision itself, *viz.*, to cease operating as a railroad and to sell its rail assets. *See First Nat'l Maintenance*, 452 U.S. at 686, 101 S.Ct. at 2584. However, *First National Maintenance* does not cut off all bargaining; it mandates bargaining over the *effects* of the transaction. There is much logic in applying this duty to bargain over effects, even in an RLA context, because both the RLA and the NLRA use similar language to describe the scope of mandatory bargaining.[14] However, although the scope of bargaining under the two statutes may be similar, plainly the processes are quite different, and unfortunately *First National Maintenance* cannot be read to rewrite the intricate RLA bargaining *process*.

P & LE contends that by granting the status quo injunction, the district court has given the union a "powerful tool for achieving delay," a tool that the *First National Maintenance* Court expressly refused to

---

mere infractions or interpretations of the provisions of that agreement").

**13.** Such bargaining, the court explained, need not be futile; it might well lead to saving some of the lost jobs, with the new operator. 351 F.2d at 191. We recognize that in the case at bar the railroad may be in no position to save lost jobs. However, it may have the ability to share some of the proceeds from the sale with its employees, as severance payments.

**14.** Section 8(d) of the NLRA requires the parties to bargain collectively "with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). Section 6 of the RLA requires the invocation of the major dispute resolution process whenever a party intends a "change in agreements affecting rates of pay, rules, or working conditions." 45 U.S.C. § 156.

give to the union. *See* 452 U.S. at 683, 101 S.Ct. at 2583 (labeling the decision to close a business a mandatory subject of bargaining "could afford a union a powerful tool for achieving delay, a power that might be used to thwart management's intentions in a manner unrelated to any feasible solution the union might propose"). However, we do not believe that *First National Maintenance* can be read to relieve the railroad of its duty to comply with the RLA bargaining process, and that process is designed to produce just such a delay. As the Supreme Court has explained:

> The Act's status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach

agreement without interruption to commerce.

*Detroit & Toledo Shore Line,* 396 U.S. at 150, 90 S.Ct. at 299.[15]

Once we have determined that a railroad employer must bargain over a particular subject (here, the effects on the employees of the sale), and that that subject implicates a change in the current agreements and working conditions (here, the elimination of many workers' jobs), the RLA process is clear, and we find nothing in *First National Maintenance* that calls it into question. Thus, under section 6 of the Railway Labor Act, the railroad must maintain the status quo, unless the status quo obligation is overriden by the ICA. To that issue, we now turn.

## IV. THE EFFECT OF THE ICC'S ACTION UNDER THE ICA ON THE RAILROAD'S DUTY TO BARGAIN UNDER THE RLA

The Interstate Commerce Act gives the ICC exclusive jurisdiction to approve and to regulate acquisitions of rail lines. *See supra* Part I.B. Pursuant to this jurisdiction, the ICC has authorized the sale of P & LE's lines to the newly-formed Railco and elected not to exercise its discretion to impose labor protective provisions on the transaction.[16] Although P & LE presents

---

**15.** We do not pretend that the imposition of the RLA bargaining *process* on this dispute will have no *substantive* effect on the outcome. In fact, we recognize that it may have a profound and damaging effect on P & LE's very ability to proceed with the transaction. However, as we have already suggested, the power of delay and the leverage given to labor is inherent in the design of the RLA, and surely was understood and contemplated by its framers. We frankly recognize that such a delay may conflict with recent policies expressed by Congress in amending the ICA. During the course of our deliberations in this case we contemplated a holding that, due to the strong tension between the policies of the RLA and the ICA in this situation, Congress could not have contemplated that effects bargaining would have to take place under the cumbersome aegis of the RLA, because the long delay involved could torpedo the sale. We ultimately rejected this solution, for the reasons discussed *supra,* Part III. However, in struggling with this issue, we did consider the possibility of alleviating the immense burden of such

a delay, possibly by ordering a streamlining of the tedious RLA process. *Cf. Brotherhood of Ry., Airline and Steamship Clerks v. REA Express,* 523 F.2d 164, 171 (2d Cir.1975) (holding that a debtor under the Bankruptcy Act need not comply with the "elaborate and protracted" RLA procedures, but rather need only "negotiate in good faith for a reasonable length of time"), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975) & 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 82 (1976). Unfortunately, we found that such a solution could not be justified here, given the lack of a direct and unavoidable conflict between the ICA and RLA. *See infra* note 50.

**16.** In its 1985 rulemaking, *Ex Parte 392, see supra* Part I.B, the ICC declared that only in "an extraordinary case," given "an exceptional showing of circustances," would the Commission impose labor protection on a transaction approved under § 10901. 1 I.C.C.2d at 815. We are unaware of any instance since that time where the ICC has found the requisite "excep-

several arguments flowing from this state of affairs, they all boil down to essentially the same contention: the ICC's approval of this transaction without imposing labor protection relieves the railroad of any duty it might otherwise have had to bargain over the effects of the sale upon the workforce or to retain the status quo.

We will address P & LE's argument in each of its formulations. However, we will first discuss the powerful congressionally-articulated policies (and administrative implementation of those policies) that support P & LE's argument. Although we ultimately reject the railroad's position, we will show how the recent trend of legislative action makes this a most difficult case, because Congress has articulated policies (although not laws) which conflict with the long and drawn out RLA bargaining procedure. These policies, as will be shown, bear heavily on the plight of P & LE.

### A. Streamlining Regulation: A Response to The Decline of the Railroad Industry

#### 1.

At the outset, we note that the railroad industry in America has been in decline for some time, and that the plight of the Pittsburgh & Lake Erie Railroad is not an uncommon one. Congress has recognized the problem and, faced with the prospect of a failing yet critically important industry, has attempted to remedy the situation, in part, through several deregulatory statutes. In 1976, in an effort to stem the financial decline of the railroads, Congress passed its first major revision of the Interstate Commerce Act since 1940—the Railroad Revitalization and Regulatory Reform Act of 1976 ("4–R"), Pub.L. No. 94–210, 90 Stat. 31. The 4–R Act began the trend toward deregulation of the railroad industry, with regard both to rate setting and to acquisition approvals. The congressional committee reports described the serious fi-

nancial difficulties of the industry, and noted the necessity for substantive changes in the way railroads were regulated, in an effort "to allow railroads to compete with other modes of transportation," while "maintain[ing] necessary protections for rail service consumers." S.Rep. No. 499, 94th Cong., 2d Sess. 1, reprinted in 1976 U.S.Code Cong. & Admin.News 14, 15; see also S.Conf.Rep. No. 595, 94th Cong., 2d Sess. 133, reprinted in 1976 U.S.Code Cong. & Admin.News 148. Congress thus began the process of streamlining the ICC's "inflexible" procedures in an effort to expedite the regulatory process, S.Rep. No. 499, 94th Cong., 2d Sess. 15, 1976 U.S.Code Cong. & Admin.News p. 28, particularly with regard to mergers and consolidations, which Congress intended to encourage, see id. at 17–21, 1976 U.S.Code Cong. & Admin.News at 30–34.

Congress' 1976 effort, however, proved to be insufficient, for the decline continued. By 1980, when Congress next addressed the problem, it recognized that more drastic measures would be necessary if revitalization of the nation's rails were to be more than just a dream. Historically, Congress found, the purpose of the ICA had been to prevent the abuse of the railroad's monopoly powers, and thus to protect the shippers and producers who were fully dependent on the rails to bring their goods to market. See H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 79 [hereinafter Staggers Conf.Rep.], reprinted in 1980 U.S.Code Cong. & Admin.News 4110. By 1980, however, the transportation market in the United States had changed dramatically, and legislation well-suited to the pre-War economy was no longer responsive to the needs of a changing society. The interstate transportation industry, once largely monopolized by rail service, had become intensely competitive, and rail service, under the yoke of a burdensome regulatory statute, was losing the battle for the marketplace. Whereas rail

---

tional circumstances." Moreover, the railroad itself concedes that the ICC has granted only one petition for revocation under Ex Parte 392, and that was not because the Commission desired to impose labor protection, but rather because the Commission found that the transac-

tion should proceed under § 11343 rather than § 10901. See Brief of Appellant at 47 n. 18. However, we do note that RLEA's petition for revocation in this case is still pending. See supra Part II.B.

transport once had carried virtually all intercity freight, by 1980 the railroads' market share had diminished to just over one third.[17] *Id.*

Finding industry earnings at or below survival levels, and finding a severe inability to generate funds for needed capital improvements, Congress concluded that a dramatic departure from the historic regulatory approach was needed. *Id.; see also* H.R.Rep. No. 1035, 96th Cong., 2d Sess. 95–119 [hereinafter Staggers House Rep.], *reprinted in* 1980 U.S.Code Cong. & Admin.News 3978, 4039–63. With its goal the rehabilitation and revitalization of a nearly-moribund industry, Congress determined to remove much of the regulatory restraint that had been in place for half a century. Staggers Conf.Rep. at 80, 1980 U.S.Code Cong. & Admin.News at 4111; *see also* Staggers House Rep. at 115, 1980 U.S.Code Cong. & Admin.News at 4059.[18]

Congress had made a start in this direction in 1976; however, the ICC did not follow through on the legislature's deregulatory efforts, and 4–R did not stem the decline. *See* Staggers House Rep. at 38, 1980 U.S.Code Cong. & Admin.News at 3983. Thus, Congress spoke more clearly, and more forcefully, in the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 [hereinafter Staggers]. In listing fifteen explicit policies for rail transportation, Congress announced in the statute itself that it is the policy of the United States "to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is re-

quired," 49 U.S.C. § 10101a(2) (1982), and "to reduce regulatory barriers to entry into and exit from the industry." § 10101a(7).[19]

Staggers eliminated much of the ICC's rate regulation function, leaving a role for the Commission only where necessary to prevent market abuses. *See, e.g.,* Staggers House Rep. at 38–39, 54, 1980 U.S.Code Cong. & Admin.News at 3983–84, 3999. More relevant to the case *sub judice,* however, was the Act's deregulation of the field of rail consolidations and acquisitions.

Prior to the enactment of Staggers, the ICC's approval process for proposed transfers of rail assets was tedious and cumbersome. *See, e.g.,* 49 U.S.C. §§ 10901, 11341–11351. For example, the approval process for proposed minor restructurings could take as long as fifteen months. *See* Staggers Conf.Rep. at 120, 1980 U.S.Code Cong. & Admin. News at 4152. Such a delay not only could burden the parties; it actually created disincentives to engage in otherwise economically efficient transactions. In 1980, therefore, Congress exempted certain transactions from regulation by the Commission; however, recognizing that Congress itself was not capable of identifying each of the precise areas that no longer required Commission involvement, Congress granted the ICC broad powers to exempt any transaction from regulation, to be used whenever

the Commission finds that the application of a provision of this subtitle—

(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

---

**17.** Although industrial production increased by 250 percent from 1947 to 1977, the railroads carried 91 percent fewer tons in 1977 than thirty years earlier. H.R.Rep. No. 1035, 96th Cong., 2d Sess. 35; *reprinted in* 1980 U.S.Code Cong. & Admin.News 3978, 3980.

**18.** The House Report makes clear that Congress recognized that excessive regulation was a major contributing factor to the rail industry's decline. *See* Staggers House Rep. at 38, 115, 1980 U.S.Code Cong. & Admin.News at 3983, 4059.

**19.** The Conference Report explained:
The specific goals of this Act are to assist the industry in the rehabilitation and financing of the rail system; to reform Federal

Regulation to preserve a safe, adequate, economical, efficient and financially stable rail system, to assist the rail system to remain viable in the private sector of the economy; and to provide a regulatory process that balances the needs of carriers, shippers, and the public. The overall purpose of the Act is to provide, through financial assistance and freedom from unnecessary regulation, the opportunity for railroads to obtain adequate earnings to restore, maintain and improve their physical facilities while achieving the financial stability of the national rail system.
Staggers Conf.Rep. at 80, 1980 U.S.Code Cong. & Admin.News at 4111.

(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 10505(a) (1982); *see* Staggers Conf.Rep. at 84, 104–05, 1980 U.S.Code Cong. & Admin.News at 4115–16, 4136–37. With respect to acquisitions of rail lines by non-carriers, Congress expressed its intent quite clearly to the Commission:

> For transactions that do not involve the merger or control of at least two Class I railroads, the Commission is *required* to approve an application unless it finds there is a likelihood of substantially lessening competition, creation of a monopoly or restraint of trade and the anticompetitive effects of the transaction outweigh the public interest.

*Id.* at 84, 1980 U.S.Code Cong. & Admin. News at 4115–16. (emphasis added).

In addition to the explicit direction to the Commission to "actively pursu[e] exemptions" from regulation, Staggers House Rep. at 60, 1980 U.S.Code Cong. & Admin. News at 4005, Congress made clear its intent to streamline the regulatory process, and thus to expedite all Commission actions. With regard to exemptions, the ICC was encouraged to adopt an after-the-fact review policy, allowing transactions to proceed forthwith, with Commission review for abuses coming after the transaction is consummated. *See* Staggers Conf.Rep. at 105, 1980 U.S.Code Cong. & Admin.News at 4137. And focusing on small, non-major merger transactions, Congress required the

Commission to reduce paperwork and to expedite approvals, particularly where such approvals are routinely and consistently granted. *Id.* at 120–21, 1980 U.S.Code Cong. & Admin.News at 4152–53.[20]

Finally, with regard to labor, Staggers added section 10901(e) to the ICA, giving the Commission the explicit power to impose labor protection, in its discretion.[21] Notably, however, in spite of the deregulatory trend, Congress did not remove any of the procedural protection or substantive rights given to labor by the RLA. In fact, Congress has not made any substantial revisions to the RLA since 1934. *See* ch. 691, 48 Stat. 1185 (1934). We find this congressional inaction significant.

### 2.

Plainly, *Ex Parte 392* and the Commission's expedited approval of the sale of P & LE's assets are an outgrowth of this strong congressional policy to remove regulatory burdens and to expedite sales of struggling railroads, as well as the explicit legislative directive to exempt transactions whenever regulation is not necessary. Prior to *Ex Parte 392*, the ICC had routinely granted exemptions from the requirements of § 10901 to non-carrier acquisition transactions on a case-by-case basis. In 1985, desiring to "meet the need for expeditious handling of a large number of requests that are rarely opposed," the Commission exempted "substantially all" § 10901 transactions, as a class. *Ex Parte 392*, 1 I.C.C. 2d 810, 811–12 (1985).[22] Plainly in line with

---

**20.** As another example of Congress' desire to reduce regulatory drag, particularly with respect to marginal rail lines, the Commission was directed to expedite abandonment proceedings, with specific statutory time limits. *See* 49 U.S.C. § 10904; Staggers Conf.Rep. at 125, 1980 U.S.Code Cong. & Admin.News at 4157.

For other discussions of the background, legislative history and purpose of the Staggers Rail Act, see *Coal Exporters Ass'n of the United States v. United States*, 745 F.2d 76, 80–82 (D.C.Cir. 1984), *cert. denied*, 471 U.S. 1072, 105 S.Ct. 2151, 85 L.Ed.2d 507 (1985); *Simmons v. ICC*, 697 F.2d 326 (D.C.Cir.1982).

**21.** Section 10901(e) states, in its entirety:

The Commission may require any rail carrier proposing both to construct and operate a

new railroad line pursuant to this section to provide a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected thereby no less protective of and beneficial to the interests of such employees than those established pursuant to section 11347 of this title [pertaining to mergers and consolidations].

49 U.S.C. § 10901(e) (1982).

**22.** *See also* 1 I.C.C.2d at 816 ("We conclude that there has been no showing of a benefit from a notice and comment period that outweighs the benefit of expeditious handling. Doing so would be inconsistent with the intent of this class exemption—to streamline current procedures.").

Congress goals, and plainly applicable to the sale of P & LE's lines, were the following Commission findings:

Transfer of a line to a new carrier that can operate the line more economically or more effectively than the existing carrier serves shipper and community interests by continuing rail service, and allows the selling railroad to eliminate lines it cannot operate economically. Transfer before a financial crisis (with attendant plans for abandonment) helps assure continued viable service.

*Id.* at 813. "The vital interests of shippers, communities, and carriers will be served by this exemption," the ICC found, "because it will result in the continuation of service that might otherwise be lost." *Id.* at 817; *see also id.* ("exemption of these transactions will foster the rail transportation policy of 49 U.S.C. 10101a").

Moreover, the Commission found that "the imposition of labor protective conditions on acquisitions and operations under 10901 could seriously jeopardize the economics of continued rail operations and result in the abandonment of the property with the attendant loss of both service and jobs on the line." *Id.* at 813.[23] The agency explicitly found that this was in accord with legislative intent. *Id.* at 814.

We owe great deference to the Commission's interpretation of its own organic statute, particularly when, as here, Congress has "explicitly left a gap for the agency to fill." *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Moreover, we think it apparent

that the streamlined expedited approval process of *Ex Parte 392* is plainly in accord with the policies discussed *supra* Part IV. A.1. Finally, we have little doubt that railroads like P & LE, on the verge of bankruptcy and having difficulty finding prospective purchasers, are precisely the kind of railroads about which Congress was most deeply concerned, and which Congress was most directly attempting to address, in its deregulatory efforts.[24]

We are thus faced with the ICC's application, in *Ex Parte 392* and in this case, of several related congressional policies: to save marginal rail lines, to encourage the flow of capital into the industry, to eliminate the imposition of costly government-imposed conditions on otherwise efficient transactions, and, perhaps most importantly, to expedite the approval process so that efficient transactions are not derailed by regulatory red tape. To a large extent, the issuance of the status quo injunction is disruptive of these strong policies. Nevertheless, we are confronted by the reality that the issuance of that injunction is fully consistent with an equally strong (and venerable) set of congressional policies—avoiding disruptions in the railroad industry by promoting collective bargaining and preventing strikes—as well as with the express statutory language of an equally valid congressional act—the RLA. The RLA is expressly designed to delay certain management decisions, in order to give rail labor more leverage. Moreover, we find nothing in the language of the Interstate Commerce Act that expressly prohibits the issuance of that injunction.

---

**23.** Of course the Commission left open the possibility of employee protection, upon petition for revocation, "[i]n an extraordinary case." 1 I.C.C.2d at 815.

**24.** The House Report expressed the legislature's concern about the rash of bankruptcies in the industry. *See* Staggers House Rep. at 99, 1980 U.S.Code Cong. & Admin.News at 4043. Moreover, the expeditious consummation of transactions involving small and marginal rail lines was plainly a goal of the Act; not only did Congress set express time limits for abandonment procedures, *see supra* note 20, but the Senate, in particular, expressed its concern about the delays in ICC processing of "smaller

transactions," *see* Staggers Conf.Rep. at 120, 1980 U.S.Code Cong. & Admin.News at 4064; *see also* 49 U.S.C. § 11345 (1982). Finally, Congress expressly desired to permit easier entry into the industry by new carriers, under § 10901, and thus lowered the standard for Commission approval. *See* Staggers Conf.Rep. at 115–16, 1980 U.S.Code Cong. & Admin.News at 4059–60. Previously, approval under § 10901 would only be granted if the public convenience or necessity "require[d] or w[ould] be enhanced" by the new entry; the new law merely requires that the public convenience or necessity "require or permit" the transaction. *Id.; see* 49 U.S.C. § 10901(a).

Unfortunately for the railroad, we find nothing in the more recent ICA that demonstrates a clear congressional intent to eviscerate the plain language of the older RLA, hence unless other factors supersede, we must refuse to accept P & LE's invitation to relieve it of its RLA bargaining duties and to deny the injunction. We now pursue analysis of those other potential factors: (1) an impermissible collateral attack; and (2) ICA preemption.

## B. *Collateral Attack*

■ P & LE, joined by the ICC as intervenor, argues that the union is simply engaging in a forbidden collateral attack on the ICC's order approving the sale transaction. P & LE contends that the ICC has authorized the sale to proceed in an expedited fashion, and that the Commission has determined that the sale would best serve the public interest if it proceeds without labor protection. P & LE claims that by seeking and gaining the district court's injunction against the sale, RLEA has effectively reversed the ICC's order, whereas such a reversal can only be sought in the court of appeals, on petition for review. *See* 28 U.S.C. §§ 2321(a), 2342(5).

Moreover, P & LE claims, the arguments made by RLEA to the district court were the very same arguments the unions made to the ICC. Given that the ICC has already rejected these arguments, by refusing to stay the sale and refusing to order protection for labor, P & LE argues that it was improper for the district court to allow the union to attack collaterally this considered decision by the administrative agency best qualified to address rail transportation issues.

We find these arguments, although appealing, to be ultimately flawed.[25]

We note first that the ICC's order was merely permissive; it authorized the consummation of the sale in its present form, but it did not mandate that the transaction be completed. If the ICC had determined that the public interest could *only* be served by the consummation of this sale without any protection for labor, and if the ICC had therefore *required* the sale to proceed forthwith, we might have been faced with a more compelling argument.[26] Had the sale been required, then the unions' efforts to enjoin the sale and to pursue the possibility that labor might gain some protection for itself at the bargaining table might constitute, in effect, an effort to overturn an administrative determination that a delay or collapse of the sale and the imposition of labor protection would harm the public interest. However, that is not this case.

The ICC approved this proposed sale under § 10901, which says that a transaction *"may"* proceed given a finding that the public interest "require[s] *or permit[s]"* the acquisition. 49 U.S.C. § 10901(a) (emphasis added). Thus, the ICC has made no finding that the public interest *requires* this transaction, that the transaction *must* proceed, or that a delay in (or even collapse of) the transaction would *harm* the public interest. Therefore, the district court's injunction does not conflict with the public interest as determined by the ICC's order, because the injunction merely granted a *delay* in the transaction, and the possibility

---

**25.** Alternatively, P & LE notes that the ICC has not yet definitively denied labor protection, as it still might grant RLEA's petition for revocation and impose retroactive protection for labor. Therefore, P & LE argues, RLEA must first exhaust its administrative remedies, which are still pending, before seeking relief in the courts. This argument, of course, rests on the same premise as the railroad's primary argument, namely, that RLEA is asserting the same rights, and seeking essentially the same relief, in the courts as it asserted and sought before the Commission. Because, as will be shown, we reject this premise, we reject this alternative argument as well.

**26.** For example, under section 10905 of the ICA, the Commission has the power to require a railroad to sell its lines to an able purchaser, if the alternative would be abandonment of the lines. A compelling argument could be, and has been, made that a status quo injunction in the face of a 10905 approval would constitute a direct attack on the ICC's determination. *See infra* note 27. In the instant case, however, P & LE has not moved to abandon its lines and subject itself to the forced sale provisions of section 10905; it merely has sought ICC permission.

that labor might win some protection for itself at the bargaining table.[27]

We are acutely sensitive to P & LE's repeated assertions that a prolonged delay, enforced by the imposition of the "purposely long and drawn out" bargaining procedures of the RLA, *see Detroit & Toledo Shore Line*, 396 U.S. at 149, 90 S.Ct. at 299 (quoting *Brotherhood of Ry. & S.S. Clerks v. Florida E. Coast Ry.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966)), could effectively kill the proposed transaction, and ultimately push the railroad into a bankruptcy proceeding.[28] Far from being unsympathetic to these concerns, we, in fact, recognize that such a result could well be contrary to the strong congressional policy in favor of rehabilitating the railroad industry. This conflict, however, is a consequence of the fact that Congress has not updated an old statute (the RLA) to keep it in tune with newer policies. We, however, are bound by the statute, because we can find no specific congressional intent to rewrite it. We therefore cannot allow our sympathies, our notions of sound policy, or even our practical judgments, to cause us to lose sight of our role—the interpretation and application of a statutory mandate.

There is no doubt that an enforced delay is harmful to management's interest in the case at bar. That, however, will always be the case whenever management's proposed change in working conditions is subjected to a status quo injunction. Such a delay is inherent in the RLA bargaining process, and is designed to give labor leverage that it otherwise would lack, and to encourage compromise that might otherwise not be forthcoming. *See Detroit & Toledo Shore Line*, 396 U.S. at 150, 90 S.Ct. at 299; *see also* Part III.B. In short, it is not for us to be concerned about the practical effects of delay on this transaction, when Congress has expressly promoted just such a delay. Although we do not view a judicially-enforced delay as an attack on the ICC's order, we do recognize that Congress has given conflicting signals as to its intent. However, because we are bound to enforce

---

27. In *RLEA v. Staten Island R.R. Corp.*, 792 F.2d 7 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987), a decision relied on heavily by P & LE, the Second Circuit found that a similar attempt by RLEA to enjoin a sale pending RLA bargaining constituted a collateral attack on an ICC order authorizing the sale, and therefore the court affirmed the district court's refusal to grant a status quo injunction. The case, however, is clearly distinguishable. The sale of the Staten Island Railroad was approved pursuant to § 10905, rather than § 10901. Section 10905 is a forced sale provision, requiring a financially ailing railroad to sell its assets to a financially responsible purchaser, as an alternative to abandonment of the line under § 10903. The ICC order in that case therefore stated that the seller *"must* complete the sale so long as the buyer consummates." 792 F.2d at 11 (emphasis added). The court therefore held that an injunction against sale could not be granted "without re[s]cission or modification of the ICC's order" mandating the consummation of the sale; such an attack, of course, would only be appropriate on direct appeal from the ICC order. *Id.* at 12.

P & LE argues that the distinction between a mandatory and permissive ICC order has been rejected by the Supreme Court in *Venner v. Michigan Cent. R.R. Co.*, 271 U.S. 127, 46 S.Ct. 444, 70 L.Ed. 868 (1926). The Court there held that the district court was without jurisdiction to enjoin an ICC-authorized transaction for failure to obtain certain state agency approvals.

The Court noted that it "makes no difference" that the ICC's order "is not mandatory, but permissive." *Id.* at 131, 46 S.Ct. at 445. The case, however, is inapposite, both because the requested injunction truly would have blocked the approved transaction as violative of state law, as opposed to merely delaying the transaction pending the exhaustion of bargaining, *see infra,* and because the case, at bottom, was a federal preemption case, declaring that *state* law could not be used to undermine a transaction once a federal law has preempted the field and a federal agency has passed on the very same issues. *See also B.F. Goodrich Co. v. Northwest Indus.*, 424 F.2d 1349, 1354 (3d Cir.), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970) (reading *Venner* to hold merely that "a permissive order as well as a mandatory one is appealable").

28. P & LE asserts that as its losses continue to mount, the railroad becomes a continually less attractive acquisition prospect, and that, in fact, the financing for the proposed Railco deal has already become a problem, in part because of the delays engendered first by the strike and now by the injunction. Railco, P & LE asserts, will not wait around forever, and Railco, as amicus, has joined in this argument. Fortunately Railco has remained interested for over six months now, and on two occasions this court has expeditiously reviewed difficult challenges to the district court's action with a view to preventing delay from killing the deal.

each of the statutes that Congress has written to the fullest extent possible, we believe P & LE's pleas are more appropriately directed to Congress.[29]

P & LE's "collateral attack" argument fails for other reasons, as well. P & LE contends that the district court's order requiring the railroad to bargain over labor protection is inconsistent with the ICC's decision to *deny* labor protection. However, the ICC merely refused to *impose* labor protective conditions on the transaction. RLEA sought and received markedly different relief in the district court: the status quo injunction does not require any substantive protection for labor; it merely requires that the parties bargain, a process which may well produce no substantive agreement.[30]

The imposition of substantive labor protection on a transaction is a somewhat unusual remedy in American labor law; the much more common approach to the protection of labor's interests has generally been to impose bargaining and procedural obligations, rather than to impose upon the parties substantive resolutions to major labor disputes.[31] The mere fact that a government agency has refused to impose an economic solution on a private labor dispute does not imply that the agency has refused to allow the parties themselves to bargain for and reach an agreement. It merely means that the agency has determined that the consummation of the transaction without labor protection would not be so extraordinarily unfair, when balanced against the benefits of the transaction, as to require government-induced substantive protection.

The dissent points out that Congress has chosen to make labor protection in § 10901 transactions discretionary rather than mandatory. *See* dissent *infra* at 449. We agree, however we do not see how this is inconsistent with our decision. We are not reversing the ICC's decision not to impose labor protection under the ICA (nor could we, even if we chose to do so, given the procedural posture of this case). We are merely enforcing a bargaining order under the *RLA*, a separate and equally important federal statute.

Moreover, any protective concessions won by the unions as a result of the RLA-imposed process do not necessarily conflict with the lack of protection imposed by the ICC. Such bargained-for concessions may be substantially less burdensome to the railroad than the typical substantive conditions imposed by the Commission. Put differently, the enforcement of the union's procedural rights should not be viewed as an attack on the ICC's determi-

---

**29.** Of course, to the extent the railroad would like us to view this situation "practically," we must note that practicality can cut both ways. We have no doubt that the unions are aware of the financial plight of the railroad, and if not, that the railroad is quite capable of presenting the stark facts to the unions, at the bargaining table. There simply is no support in the record for P & LE's insinuation that the unions are motivated by a perverse desire to destroy the enterprise rather than to secure what is best for their members. We therefore refuse to presume that the unions will intentionally force the railroad into bankruptcy, a result that would benefit no one.

**30.** *See supra* Part I.A. for a description of the largely "conciliatory" RLA bargaining process.

**31.** *See, e.g.,* RLA § 2 First, 45 U.S.C. § 152 First (1982) ("It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements ... and to settle all disputes arising out of the application of such agreements....");

NLRA § 1, 29 U.S.C. § 151 (1982) ("Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury...."); *id.* ("the policy of the United States [is to] ... encourag[e] the practice and procedure of collective bargaining"); NLRA § 8(d), 29 U.S.C. § 158(d) (1982) (it shall be an unfair labor practice to refuse to "confer in good faith with respect to wages, hours, and other terms and conditions of employment").

For a discussion of typical substantive labor protective conditions traditionally imposed by the ICC, see *New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979). *See also* 49 U.S.C. § 11347 (1985) ("The arrangement [for the protection of employees] and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the [Commission order]"). The provisions are mandatory with respect to mergers, but discretionary with respect to acquisitions by non-carriers. *See* § 10901(e).

nation that burdensome substantive protections would be detrimental to the public interest. Nevertheless, P & LE insists that RLEA's complaint constitutes a collateral attack because the injunction, in essence, blocks the sale, by giving the union a practical veto power over the ICC-approved transaction.[32] The argument, however, misconstrues the nature of the injunction. More importantly, the argument is essentially a disguised attack on the RLA itself.

The injunction does not block the sale, it merely delays it (albeit for longer than P & LE might be able to afford). Once the parties have exhausted the RLA remedies, if no agreement has been reached, the status quo obligation is lifted. Moreover, the injunction does not give the unions a veto power over the sale; it merely promotes the possibility of a mutually agreeable solution, by fostering the bargaining process. To the extent that P & LE is unhappy with this enforced delay, and its concomitant duty to bargain, P & LE is not simply defending the integrity of an ICC order; it is attacking the major premise of the RLA itself. *See supra* Part I.A. Such an attack, although we are sympathetic to it, is more appropriately directed to Congress than to the courts.

### C. *Preemption*

■ P & LE contends that the Interstate Commerce Act, as administered by the Interstate Commerce Commission, has preempted the field of labor protection in rail transportation transactions. Any duty to continue operating its rail lines pending exhaustion of the RLA bargaining process, argues P & LE, is inconsistent with the ICC's plenary authorization of the expeditious consummation of the sale to Railco. Given the "inherent and obvious conflict between the ICC's jurisdiction and an effects bargaining obligation," P & LE argues that "the inconsistent requirements of the RLA must yield" to the superior and expansive authority of the ICC under the ICA. Brief of Appellant at 42. *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318, 321, 101 S.Ct. 1124, 1130, 1131, 67 L.Ed.2d 258 (1981) (the ICA "is among the most pervasive and comprehensive of federal regulatory schemes"; the "exclusive and plenary nature of the Commission's authority to rule on carriers' decisions to abandon lines is critical to the congressional scheme, which contemplates comprehensive administrative regulation of interstate commerce"). We disagree with P & LE's argument.

We readily acknowledge the significant tension between the means used by the two statutes to achieve similar statutory ends, namely, to protect and promote interstate rail transport. The RLA, in an effort to prevent strikes, imposes a regulatory structure on the parties, forcing them to forgo any unilateral action pending exhaustion of a lengthy process. In contrast, the ICA, as currently administered by the ICC and in an effort to prevent failures and abandonments, removes regulatory burdens and favors an expeditious process. However, if at all possible (and we believe that it is possible), we have an obligation to read the two statutes in harmony, avoiding unnecessary conflict, for it is clear that repeals by implication are heavily disfavored. *See Watt v. Alaska*, 451 U.S. 259, 266–67, 101

---

**32.** The railroad supports its argument that the union has been given a veto power over the sale by attempting to demonstrate to us that the unions' real motive is to block the sale to Railco and instead force a sale to the union. We, of course, intimate no view on this question of fact. However, we do note that the appropriate way for the railroad to present this argument would be as a challenge to the union's good faith in trying to reach agreement over the effects of the transaction. The union, like the employer, has an obligation under § 2 First of the RLA "to exert every reasonable effort to make and maintain agreements." 45 U.S.C. § 152 First. Once the RLA bargaining process is underway, the railroad is free to challenge the union's good faith in the appropriate forum. That challenge, however, is currently premature.

We therefore also reject the railroad's contention that the district court improperly granted summary judgment in spite of outstanding disputed issues of fact. We do not view the questions of the union's underlying motives, or any of the other purportedly disputed issues of fact raised by P & LE in its brief, to be material to the availability of a status quo injunction.

S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981).[33] Moreover, even if we were to find a direct conflict between the mandates of these two venerable and comprehensive statutory schemes, it is unclear that it is the ICA which should preempt the RLA.[34]

The RLA has been on the books, unchanged for our purposes, for over half a century. We are wary of surmising about legislative intent, or inferring too much from legislative inaction. Yet we cannot help but note that Congress, in spite of its apparent and extensive efforts to deregulate the rail industry, has not seen fit to deregulate, or even to streamline, the bargaining process that has governed the industry for so long. Congress has made the legislative determination to deregulate the rail industry by removing many administrative burdens, but even while focusing on deregulation Congress chose not to modify the cumbersome procedures of the RLA. Given these recent legislative efforts in the area, it would be inappropriate for us to act where Congress has chosen not to act.

Moreover, we do not find the effect of the RLA to be as inconsistent with the ICC's jurisdiction and action as P & LE claims. P & LE claims that the ICA presents a detailed and comprehensive regulatory scheme, and that therefore labor should not be allowed to assert rights contrary to the public interest as determined by the ICC. Yet even if an ICC decision to deny labor protection reflects more than merely a decision by the ICC that labor protection is not *necessary* to protect the public interest, *see supra* Part IV.B., it plainly is a decision made from a perspective on the public interest very different from that of the RLA.

The ICC's perspective, and in fact its mandate, is to focus on national transportation policy, and to foster an efficient and effective rail transportation system. *See* 49 U.S.C. § 10101a.[35] Section 10101a,

---

**33.** The Court in *Watt* made clear that when called upon to interpret two statutes which, on their face, appear to conflict, it would be guided by the "maxim: 'repeals by implication are not favored.' ... 'The intention of the legislature to repeal must be "clear and manifest." ' ... We must read the statutes to give effect to each if we can do so while preserving their sense and purpose." 451 U.S. at 267, 101 S.Ct. at 1678 (citations omitted).

**34.** We find the Supreme Court's decision in *Kalo Brick,* 450 U.S. 311, 101 S.Ct. 1124, to be of no import here. That case declared that ICC action preempts all inconsistent state laws, because the federal government has exclusive jurisdiction over interstate commerce, when it elects to exercise it. The case gives no indication of the ICC's authority with respect to potentially inconsistent federal laws.

**35.** Section 10101a, in its entirety, states:

In regulating the railroad industry, it is the policy of the United States Government—

(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;

(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;

(7) to reduce regulatory barriers to entry into and exit from the industry;

(8) to operate transportation facilities and equipment without detriment to the public health and safety;

(9) to cooperate with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;

(10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation;

(11) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;

(12) to encourage fair wages and safe and suitable working conditions in the railroad industry;

(13) to prohibit predatory pricing and practices, to avoid undue concentrations of mar-

quoted in the margin, lists fifteen distinct policies upon which the ICC must focus. Of the subsections relevant to this transaction (§ 10101a(1)–(5), (7)–(8), (12), and (14)), it is plain that only one directs the ICC's attention to the interests of labor, *viz.,* § 10101a(12). Each of the other policies directs the ICC to promote competition, efficiency, and service, and to remove regulatory impediments. It is plain that the interests of labor are, at best, only a relatively small concern of the ICC. We therefore find it highly unlikely that Congress intended that rail labor look to the ICC as its sole source of protection. We find it much more likely that Congress directed the ICC to concern itself with rail labor's interests only to the extent necessary to maintain and promote an adequate and efficient rail transportation system, while leaving the RLA intact as the mechanism for labor to assert its own interests. *See RLEA v. P & LE,* 831 F.2d at 1235 ("Nothing in the statutory language [of the ICA] suggests that this incidental reference to 'fair wages' [in § 10101a(12) ] converts the regulatory scheme over rail transport into a labor law.").

We find support for this proposition in the case of *United States v. Lowden,* 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939), in which the Supreme Court approved the ICC's discretionary imposition of labor protection on railroad consolidations, even without explicit statutory authorization. The Court discussed the purpose of such protective measures:

It is thus apparent that the steps involved in carrying out the Congressional policy of railroad consolidation in such manner as to secure the desired economy and efficiency will unavoidably subject railroad labor relations to serious stress and *its harsh consequences may so seri-*

*ously affect employee morale as to require their mitigation both in the interest of the successful prosecution of the Congressional policy of consolidation and of the efficient operation of the industry itself,* both of which are of public concern within the meaning of the statute.

*Id.* at 233, 60 S.Ct. at 252 (footnote omitted) (emphasis added); *see also id.* at 238, 60 S.Ct. at 255. Plainly, the Court viewed these measures as a means of implementing the ICA's concern for the health of the industry and not its concern for the interests of labor *qua* labor.[36]

We also note that the ICC's own explanation for a recent decision to deny labor protection is fully consistent with our assessment of its perspective. Because the case constitutes the best available evidence of the Commission's thought processes in deciding whether to impose labor protection, we discuss it in some detail. In *Northwestern Pacific Acquiring Corp. & Eureka Southern R.R. Co.—Exemption From 49 U.S.C. 10901 and 11301,* Finance Docket No. 30555 (Dec. 22, 1987), the Commission, in an extended court-mandated discussion, explained its decision to deny RLEA's request for labor protection. Although it admittedly was not persuaded that the harm to labor was as great as the union claimed (because many workers would retain their jobs with the acquiring railroad, and the alternative might be abandonment and loss of all jobs), it made clear that its primary concern was with promoting rail transportation and not with protecting labor's interest.

The Commission recognized that labor protection would tend "to encourage fair wages and safe and suitable working conditions," *see* § 10101a(12), yet it nevertheless

---

ket power and to prohibit unlawful discrimination;

 (14) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information; and

 (15) to encourage and promote energy conservation.

49 U.S.C. § 10101a.

**36.** The *Lowden* Court also appeared to contemplate, without any hesitation, the coexistence of the labor protective powers of the ICC and the dispute resolution mechanisms of the RLA. *See* 308 U.S. at 233 n. 2, 235–36, 60 S.Ct. at 253 n. 2, 253–54 (citing 43 Monthly Lab.Rev. 867 (1936) (union invokes services of National Mediation Board, pursuant to RLA § 6, to procure agreement on job protection resulting from rail consolidations)).

found that imposition of such protection would generally "burden the selling carrier and frustrate the statutory mandate to foster sound economic conditions in transportation." *Northwestern Pacific* at 3. The Commission emphasized the harsh financial burden that protection would impose on the carrier, and the possibility that the burden would be so great as to cause the sale to collapse. *Id.* at 4, 7, 13. Its concern was with "the public interest overall," in spite of any "adverse impacts on affected employees." *Id.* at 11.

Ultimately, the Commission made clear that its "principal goal" was to ensure that "service over the line continues." *Id.* at 4 n. 9. " '[A]lthough individual employees are the primary beneficiaries' " of any labor protection, " 'their interests are secondary to promoting the welfare of the national transportation system.' " *Id.* at 5 n. 10 (quoting *CMC Real Estate Corp. v. ICC,* 807 F.2d 1025, 1038 (D.C.Cir.1986) (quoting *Simmons v. ICC,* 697 F.2d 326, 335 (D.C. Cir.1982))).

We have little difficulty in concluding that Congress relegated labor's interest to only an incidental concern of the ICC, because we think it clear that Congress has enacted equally trenchant yet separate legislation to deal with the unique problems of labor in the rail transportation industry, legislation that Congress intended to coexist with (rather than play second fiddle to) the ICA. *Cf. RLEA v. P & LE,* 831 F.2d at 1236 ("The ICC's authority to consider the incidental effect of the transaction on labor and its discretionary authority to require

provisions that protect employees do not make the Interstate Commerce Act comparable to the Railway Labor Act, which contains a comprehensive scheme of alternative dispute resolution mechanisms."). Moreover, the ICC itself has recognized that it lacks "expert competence" in the field of labor-management relations. *Leavens v. Burlington N., Inc.,* 348 I.C.C. 962, 975 (1977); *accord Brotherhood of Locomotive Eng'rs v. Chicago & N.W. Transp. Co.,* 366 I.C.C. 857, 861 (1983).[37] We cannot agree with P & LE that Congress intended that rail labor look for its sole protection to an agency that lacks expertise in this field.[38] We therefore cannot agree, without a clearer expression of congressional intent, that the ICC's exclusive jurisdiction over the proposed transaction preempts any potentially inconsistent RLA duties.

We recognize that, to some extent, the policy of the RLA is congruent with the policy of the ICA; both acts reflect a congressional desire to keep the rails running. However, whereas the ICA's focus is on promoting competition and efficiency, *see* § 10101a(1)–(5), the RLA's focus is on preventing strikes, *see Detroit & Toledo Shore Line,* 396 U.S. at 148–49 & n. 13, 90 S.Ct. at 298–99 & n. 13; 45 U.S.C. § 151a(1). To the extent that we should be concerned about the effect of a strike by P & LE's unions on the continuation of rail service,[39] the ICC has no power to prevent a strike, *see RLEA v. P & LE,* 831 F.2d 1231 (3d Cir.1987); only a bargaining order under the RLA can ensure that labor will

---

**37.** In *Leavens,* the ICC refused to resolve a dispute arising out of employee protective conditions that the Commission had imposed, because the claimed injury did not stem directly from the approved merger. In its ruling, the Commission noted that its "responsibility to impose protective conditions in a merger was not meant to give the Commission a right to interfere in the normal give and take of collective bargaining." 348 I.C.C. at 976.

**38.** Judge Sloviter, writing for the court in the earlier appeal of this case, recognized that if the railroad is not required to submit to " 'extensive negotiations and bargaining,' RLEA and the employees it represents would be relegated to 'a small voice of protest' " at the ICC. *RLEA v. P & LE,* 831 F.2d at 1237 (quoting *Texas & N.O.*

*R.R. Co. v. Brotherhood of R.R. Trainmen,* 307 F.2d 151, 158 (5th Cir.1962), *cert. denied,* 371 U.S. 952, 83 S.Ct. 508, 9 L.Ed.2d 500 (1963)). We do not believe that this was Congress' intent.

**39.** P & LE has asserted that a "strike and other picketing activity by P & LE's unions will disrupt P & LE's operations and result in their shutdown, causing irreparable injury to P & LE and injury to P & LE's shippers, its employees and the economies of the communities served by P & LE." P & LE's Verified Counterclaim ¶ 13, J.A. 11, 14. *See also* Affidavit of James D. Peters, P & LE's Director of Labor Relations ¶¶ 18, 19, J.A. at 24, 27 (strike has interrupted, and if not enjoined will continue to interrupt, P & LE operations).

not engage in a work stoppage. *See Detroit & Toledo Shore Line*, 396 U.S. at 150, 90 S.Ct. at 299 ("immediate effect [of the status quo requirement] is to prevent the union from striking and management from doing anything that would justify a strike"). The status quo obligation is central to the design of the RLA, *id.*, and we therefore are particularly reluctant to find preemption of that obligation without a clearer expression of congressional intent.

Furthermore, we are not even certain that preemption is truly necessary to comport with the national transportation policy. Congress was willing to streamline the regulatory process in Staggers because it found that process to be counterproductive, in that regulatory "drag" was largely responsible for the ailing condition of the rail industry, while such regulation was producing little countervailing benefit.[40] The bargaining process that is furthered by the status quo injunction, however, plainly does have countervailing benefits, not the least of which is the avoidance of strikes during the pendency of bargaining. Reasonable people can differ about how to weigh the advantages of labor peace on a failing railway, when compared to the benefits of an expeditious influx of new capital into P & LE's rail lines. However, such a policy balance is not for us to make. We read the RLA to express a congressional policy in favor of labor peace (and its corollary benefits of labor leverage at the bargaining table), even at the expense of substantial cost to management. We therefore are not at all certain that some delay in the consummation of the proposed sale is inconsistent with national transportation policy, which merely favors the removal of regulatory restraints when they are plainly counterproductive. We are not prepared to say that the restraints imposed by the RLA are comparable to the regulatory burdens removed by Staggers. Moreover, we note that the labor peace guaranteed by the RLA is surely congruent with the goals of national transportation policy and the ICA, because labor peace is arguably essential to keep the rails running. *See supra* note 39.

P & LE, however, argues that we should defer to the views expressed by the ICC, as intervenor and in prior administrative decisions, that RLA requirements are superseded by an ICC order exempting a transaction from regulation. *See Chevron, U.S. A. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) ("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer") (footnote omitted). We, however, think it is sufficient to note that the ICC has not been charged with the administration of the RLA, nor has it had occasion or power to rule on an RLA bargaining question. We therefore find deference inappropriate in this case.

Finally, we note that P & LE, in its brief to this court, has presented an impressive number of cases that it claims point unerringly in the direction of the preeminence of the ICA. We fully concede that the trend in the caselaw has been to diminish the delaying effect of the RLA in cases where the ICC has approved the expeditious consummation of a transaction. We, however, believe ourselves powerless to ignore the mandate of the RLA, in spite of any contrary trend in the caselaw and in public policy. Moreover, we find each of the court of appeals cases distinguishable. We will discuss briefly the two cases which we find most closely analogous.[41]

---

**40.** Moreover, Congress, in Staggers, gave no indication that it was disenchanted with labor regulation. Congress focused its deregulatory efforts on artificial barriers to entry, unnecessary price controls, and excessive red tape, but did not remove any of the regulatory structure affecting labor-management relations in the rail industry. *See generally* H.R. Conf.Rep. No. 1430, 96th Cong., 2d Sess., *reprinted in* 1980 U.S. Code Cong. & Admin.News 4110.

**41.** See also *supra* note 27, for a discussion of *RLEA v. Staten Island R.R. Corp.*, 792 F.2d 7 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987), the case relied on most heavily by P & LE. *Staten Island* was followed blindly, and we believe incorrectly, by a number of district courts faced with distinguishable factual situations. *See, e.g., United Transp. Union v. Burlington N. R.R.*, 672 F.Supp. 1579 (D.Mont.1987); *RLEA v. Chicago & N.W.*

In *International Association of Machinists v. Northeast Airlines*, 473 F.2d 549 (1st Cir.), *cert. denied*, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972), an examiner for the Civil Aeronautics Board ("CAB") had approved a merger between Northeast and Delta Airlines.[42] One of Northeast's unions sought an injunction to stop the sale, pending bargaining over the effects of the merger under the RLA.[43] The district court denied the injunction, and the court of appeals affirmed, holding that Northeast had no duty to bargain over the effects of a merger subject to CAB approval. However, the court explicitly relied on three factors that are not present in the instant dispute, and that the court found made that case particularly inappropriate for injunctive relief.

First, the court found no significant harm to the union in denying the injunction (when compared to the harm to the airline in delaying the merger), because the CAB examiner had already proposed "[e]xtensive labor protective provisions." 473 F.2d at 553. P & LE's unions have been granted no comparable protection. Second, in balancing the equities, the court found that the union itself had "enhanced the danger" that the deal would collapse, by delaying its demand for negotiations for several months. *Id.* at 554. No such delay is claimed in our case.

Finally, the court noted that, "[p]ossibly were the need for negotiation compelling, we would feel differently." *Id.* at 559.

However, the court found that "Delta's employees, who would have no opportunity to participate, could be injured by whatever benefits NE's employees secure in premerger negotiations with their own employer," and therefore the court found that "need points both ways." *Id.* Railco, as a newly-formed carrier, has no employees who could be burdened by any protection won by RLEA at the bargaining table, and thus P & LE's employees' "need for negotiation" is significantly more compelling.[44]

More recently, the First Circuit again found for the employer in a similar dispute. In *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d 794 (1st Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986), the ICC had approved the defendant's decision to lease certain track rights to another railroad. The union demanded that the railroad bargain over the consequential reduction in jobs. The court recognized that the union had raised a major dispute, *id.* at 798–99, but refused to enjoin the transaction. The court, however, relied explicitly on the ICC's express, self-executing power to exempt the transaction "from all other law" under 49 U.S.C. § 11341(a). 788 F.2d at 800–01. This section, by its terms, is applicable only to transactions involving "combinations," and not to acquisitions by non-carriers. *See* 49 U.S.C. § 11341(a). P & LE's proposed sale, in contrast, was approved by the ICC under § 10901 as a

---

*Transp. Co.*, 124 L.R.R.M. (BNA) 2715 (D.Minn.), *appeal docketed*, No. 87–5071–MN (8th Cir.1987); *RLEA v. City of Galveston*, 685 F.Supp. 158 (S.D.Tex.1987); *Decker v. CSX Transp., Inc.*, 672 F.Supp. 674 (W.D.N.Y.1987). The dissent cites some of these as well as other cases for the proposition that, "[u]ntil today, the judiciary has not tolerated collateral attacks on ICC-approved abandonments." At 450. To the extent that the cases cited by the dissent involved genuine collateral attacks on ICC orders, we agree with the non-controversial proposition that such attacks are not allowed. We believe, however, that this begs the question presented here, because, as we have exhaustively demonstrated, RLEA's request for an RLA status quo injunction does not constitute such a collateral attack.

**42.** The CAB's jurisdiction over airline mergers and acquisitions was roughly comparable, for our purposes, to the ICC's jurisdiction over rail transactions. *See* 49 U.S.C. § 1378 (1982).

**43.** The major dispute resolution procedures of the RLA are made applicable to the airline industry by 45 U.S.C. § 181 (1982).

**44.** We note, moreover, that we are unsure whether the First Circuit's decision to "balance the equities" to determine whether a status quo injunction should issue, was appropriate. It is far from clear that the availability of the injunction *vel non* is a matter of equitable discretion; in fact, the language of the RLA sounds quite mandatory. *See, e.g.,* 45 U.S.C. § 156 (1982) ("rates of pay, rules, or working conditions *shall not be altered* by the carrier") (emphasis added).

noncarrier acquisition.[45] We therefore find no court of appeals case on point that persuades us to reverse the injunction.

### D. *Summary*

Congress has plainly expressed a policy in favor of expedited approvals of rail acquisitions, particularly in cases of marginal rail lines. The ICC, in furtherance of this sound policy, has given Railco and P & LE permission to proceed with their proposed transaction. The Commission, in its discretion, has chosen not to impose substantive labor protective conditions upon the parties to the transaction. However, in spite of these strong administrative efforts to further congressional policy, we do not find, in either that policy or the ICC decisions, either an intent to override or an irreconcilable conflict with the statutorily mandated procedures of the RLA, and thus we cannot relieve the railroad of its statutory obligation to bargain and maintain the status quo. The railroad's obligation to bargain with its unions prior to completing the sale does not conflict with the ICC order because the ICC has simply made the determination that the public interest would "permit" the consummation of the sale, and that the effects of the sale, from the perspective of the transportation-oriented ICC, are not so extraordinarily unfair as to require government-imposed substantive labor protection. Although there is undoubtedly a strong tension between the policy of the newer act and the mandate of the older one, and although the consequence of the imposition of this older statutory mandate may be the destruction of P & LE's business, we are constrained to reconcile the two laws and to allow RLEA to attempt to use its leverage at the bargaining table.

## V. CONCLUSION

We are fully aware of the unfortunate ramifications and irony of our decision. A bargaining order, and a status quo injunction, designed to foster conciliation, promote labor peace, and ultimately keep the rails running, may ultimately have the perverse effect of destroying the only chance P & LE has for survival and perhaps even the very jobs that the unions are now trying to protect. Although we are not happy with this result, we feel constrained to reach it, because the Supreme Court has appropriately admonished the judiciary not to apply its own brand of "common sense" in the face of a contrary statutory mandate. *See TVA v. Hill*, 437 U.S. 153, 193–95, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978).[46]

We recognize, of course, that the statutory mandate is in tension with more recent congressional policies. However, we do not feel free to translate those abstract policies into a repeal of a black-letter law. If we have misinterpreted congressional intent, we can only hope that Congress speaks more clearly and consistently quite soon. As we explained in *Superior Oil Co. v. Andrus*, 656 F.2d 33 (3d Cir.1981), " '[i]t is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written.' " *Id.* at 41 (quoting *United States v. Great N. Ry.*, 343 U.S. 562, 575, 72 S.Ct. 985, 993, 96

---

**45.** We therefore express no view on the power of the ICC to relieve a carrier of its RLA duties, pursuant to § 11341(a).

**46.** In *Hill*, plaintiffs had sought an injunction against the completion of the multi-million dollar Tellico Dam, because such completion would probably destroy the snail darter's "critical habitat," and endanger its continued existence as a species, in violation of the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1543. The court was "urged to view the Endangered Species Act 'reasonably,' and hence shape a remedy 'that accords with some modicum of common sense and the public weal.' " 437 U.S. at 194, 98 S.Ct. at 2302 (citation omitted). However, the court responded: "is that our function?

We have no expert knowledge on the subject of endangered species, much less do we have a mandate from the people to strike a balance of equities on the side of the Tellico Dam." *Id.* Citing the importance of separation of powers, the Court refused to make an equitable judgment that a statutory mandate makes no sense. That, the Court held, was for the political branches. *Id.* at 194–95, 98 S.Ct. at 2301–02.

Ultimately, Congress granted the relief to the dam that the Supreme Court denied in *Hill*, "but it did so in a fashion that could not have been tailored by the courts." *Board of Governors v. Dimension Fin. Corp.*, 474 U.S. 361, 374, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986).

L.Ed. 1142 (1952)). If the statute places a greater burden on a party than we feel fair, it is Congress's function, not the court's, to readjust that burden. *Id.*

We nevertheless will urge the National Mediation Board, to the extent it is within the Board's powers, to minimize the burden on the railroad, if possible. The Board's ultimate goal, of course, should be to promote conciliation and possibly agreement.[47] Naturally, as long as this continues to be a reasonable possibility, the Board should conduct itself in the usual manner and refrain from releasing the parties from mediation. However, this need not become an "interminable" process.[48] We would hope that the Board, in deference to the plight of the railroad, and to the competing congressional policy favoring expedited regulatory approvals, would streamline its procedures to the extent possible and not keep the parties in mediation any longer than absolutely necessary. When progress is no longer forthcoming, we would hope that the Board would release the parties, forthwith.[49] In sum, it would seem that this case need not require the "purposely long and drawn out" approach of more typical major railway disputes, that such delay runs counter to the public interest, and, in fact, that congressional intent might well require something much more expeditious.[50]

The order of the district court will be affirmed.

HUTCHINSON, Circuit Judge, dissenting.

The difficulties of statutory exegesis with which the opinion for the court strug-

---

**47.** Section 6 of the RLA expressly requires the parties to a major dispute to submit to mediation upon the request of either party, or upon the proffer of the National Mediation Board. 45 U.S.C. § 156. The function of the Board in a major dispute is described in section 5 First, 45 U.S.C. § 155 First (1982). *See also Brotherhood of Railroad Trainmen,* 394 U.S. at 378, 89 S.Ct. at 1115, discussed *supra* Part I.A.

**48.** Moreover, we doubt, given the rail transportation policies expressed in Staggers, that Congress would intend that this particular process be "interminable," though there is no evidence that Congress has focused on the question.

We also note that, to the extent the delay inherent in the RLA bargaining process is harmful to the railroad's interests, the railroad is not totally powerless to release itself from the constraints of the injunction. Although the injunction necessarily conflicts with immediate consummation simply because the sale cannot be completed until the terms of the injunction have been satisfied, i.e., until the railroad reaches agreement with its unions or the parties exhaust the bargaining procedures, we note that the consummation of the sale need not necessarily await release from mediation by the Board. It is, after all, open to P & LE to reach agreement with its unions, thus releasing itself from the strictures of its status quo obligation.

**49.** Presumably, the Board would still proffer arbitration in accord with section 5 First of the RLA, 45 U.S.C. § 155 First.

**50.** Good faith bargaining under the NLRA need not be an interminable process. The Mediation Board, in its efforts to mediate with an eye toward expedition, might wish to borrow from NLRA principles, and stand ready to find an impasse between the parties more readily than normal. *See, e.g., E.I. duPont de Nemours & Co.,* 268 N.L.R.B. 1075, 1076 (1984) (NLRB need not be reluctant to find impasse, when further bargaining would be futile). For a discussion of factors approved by this court in determining whether impasse has been reached, *see Saunders House v. NLRB,* 719 F.2d 683, 687 (3d Cir.1983), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 554 (1984).

Although we urge the Mediation Board to look to the NLRA for guidance in its efforts to expedite the process, we note that we do not go as far as we might have, had we found a clearer intent to relieve the railroad of its RLA duties. Where such an intent can be found, at least one court has shown a willingness to streamline the RLA process. In *Brotherhood of Railway, Airline and Steamship Clerks v. REA Express,* 523 F.2d 164 (2d Cir.), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975) & 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 82 (1976), the court concluded that a debtor-in-possession under the old Bankruptcy Act was technically a new employer, and therefore not subject to the same statutory strictures that would have hindered its predecessor. The court therefore held that, given that the employer was "teetering on the brink of disaster," it need not comply with the "elaborate and protracted" RLA procedures. *Id.* at 171. Rather, the court allowed the debtor merely to "negotiate in good faith for a reasonable length of time," prior to implementing a unilateral reduction in operations. *Id.* Unfortunately, however, the ICA, unlike the Bankruptcy Act, does not impose its own set of elaborate procedural requirements on a rail employer in order to protect it from economic disaster. P & LE is therefore constrained to comply with the RLA.

gles are common and all too real in statutes affecting politically and economically potent interest groups. The understandable institutional constraints imposed on the political branches of our tripartite government often leave an ambiguous no-man's land of conflict between different statutes affecting the same parties. As the opinion for the court recognizes, it is nevertheless our task to reconcile the differences between the statutes, if possible, and when their terms are irreconcilable, to determine as best we can the intent of Congress. *See TVA v. Hill*, 437 U.S. 153, 193–94, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978); *Superior Oil Co. v. Andrus*, 656 F.2d 33, 41–42 (3d Cir.1981).

I believe the result the court reaches directly contravenes the Staggers Act. Therefore, I respectfully dissent. The court's opinion shows its distaste for the effects of its decision in a real world of a weakened and contracting rail industry. It nevertheless concludes that Congress's failure to provide an express waiver of the RLA's protracted dispute resolution procedures for ICC-approved sales of railway lines to non-carriers requires courts to let those lines bleed away their resources in a continuing *status quo* while hope of preserving any service, or any jobs, seeps away. I believe the RLA and the ICA are inherently contradictory in this respect and that Congress intended the ICA to prevail.

The Supreme Court has established a company's right to sell its business without having to bargain over the decision to do so. *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 686, 101 S.Ct. 2573, 2584, 69 L.Ed.2d 318 (1981). When that decision is made primarily for economic reasons, and labor concessions can only have an incremental impact, mandatory bargaining is not required. The large, ongoing losses the record shows P & LE suffers under the *status quo* threaten its impending bankruptcy. That fact distinguishes *Order of R.R. Telegraphers v. Chicago and North Western Rail Co.*, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). In *Telegraphers* the railroad sought only to abandon several stations and consolidate its operations. The union sought bargaining under § 6 of the RLA to amend the collective bargaining agreement by adding a new provision requiring the railroad to bargain over discontinued jobs. The Supreme Court held that the union was entitled to strike in order to compel bargaining and could not be enjoined from doing so under the Norris–LaGuardia Act.

Unlike *Telegraphers*, this case involves the sale of an entire rail system to a new carrier under the ICA with ICC approval. The court imposes a mandatory bargaining restraint on the decision to sell, in conflict with the Supreme Court's bright line rule in *First Nat'l Maintenance Corp.* A *status quo* requirement contradicts the ICC's approval of the sale of the P & LE to Railco and makes that approval obsolete. There is a distinction between allowing a union to exert economic pressure on the employer, by invoking Norris–LaGuardia's prohibition on injunctions against strikes, and ordering mandatory bargaining in opposition to the ICC's statutory authority under the ICA.

The imposition of RLA *status quo* bargaining destroys the entire ICA scheme for the expedited sale of ailing railroads to new carriers. Recent amendments to the ICA demonstrate Congress's conclusion that the railroad industry was "over-regulated" and that this excess regulation was a substantial factor in causing the industry to fall behind in competition with other types of transportation. Convinced that changes were needed in order to save a failing industry, Congress enacted the 4–R Act and the Staggers Act of 1980 to streamline rail regulation.

Under the ICA, as so amended, Congress has provided the ICC with fifteen policies to guide the Commission in regulating the rail industry. 49 U.S.C. § 10101a. Congress sought to restore, maintain and improve the physical and financial soundness of the rail industry, and create "a regulatory process that balances the needs of carriers, shippers, and the public." Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895, § 3; *see* 49 U.S.C.A. § 10101a (historical note). The Supreme Court has recognized that the needs of these various interests, including labor, must be balanced with the need to keep the

railroads running. *Chicago and North Western Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321, 101 S.Ct. 1124, 1132, 67 L.Ed.2d 258 (1981). Prohibiting the sale and maintaining the *status quo* until RLA bargaining procedures are exhausted largely ignores all but one of the fifteen factors, viz: labor interests.

Under the ICA, the ICC has exclusive jurisdiction over transportation by rail carriers. 49 U.S.C. § 10501(d).[1] In contrast to the mandatory provisions for other rail transactions, such as abandonments, the imposition of labor protective conditions in the sale of railroad lines to new carriers was left by Congress to the ICC's discretion:

> The Commission may require any rail carrier proposing both to construct and operate a new railroad line pursuant to this section to provide a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected thereby no less protective of and beneficial to the interests of such employees than those established pursuant to section 11347 of this title.

49 U.S.C. § 10901(e). *See RLEA v. United States,* 791 F.2d 994 (2d Cir.1986) (ICC has discretion under § 10901 to impose labor protective conditions); *RLEA v. ICC,* 784 F.2d 959 (9th Cir.1986) (courts agree ICC has discretion within § 10901 to impose labor protective conditions in acquisition by non-carrier); *Black v. ICC,* 762 F.2d 106 (D.C.Cir.1985) (labor protective conditions are mandatory for § 11343 of ICA and discretionary for § 10901); *RLEA v. ICC,* 735 F.2d 691 (2d Cir.1984) (in passing Staggers Act Congress intended to retain ICC's traditional policy of not imposing mandatory labor protective conditions on entire line abandonments, even though mandatory language of § 10903 appeared to apply); *RLEA v. United States,* 697 F.2d 285 (10th Cir.1983) (per curiam) (labor protective conditions can only be imposed on vendor/abandoning carrier and not upon ac-quiring non-carrier under § 10901); *Simmons v. ICC,* 697 F.2d 326 (D.C.Cir.1982) (Congress, in recognizing need to abandon competing regulatory policies in abandonment cases, left traditional ICC labor policies largely untouched in 4–R and Staggers Acts); *In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 658 F.2d 1149 (7th Cir.1981) (labor protective conditions may only be imposed on vendor/abandoning carrier and not on acquiring non-carrier under § 10901), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982).

Congress also gave the ICC power to exempt transactions from the ICA if regulation would not further the transportation policy embodied in § 10101a and there was no threat to shippers of an abuse of market power. 49 U.S.C. § 10505(a). If the ICC finds that application of the ICA becomes necessary, it can revoke the exemption. 49 U.S.C. § 10505(d). The ICC may not "relieve a carrier of its obligation to protect the interests of employees as required by this [Act]" in granting an exemption. 49 U.S.C. § 10505(g)(2).

The unions have failed in their attempts to persuade Congress to amend the ICA to include mandatory labor protections. *See* H.R. Conf.Rep. No. 1012, 99th Cong., 2d Sess. 250, *reprinted in* 1986 U.S. Code Cong. & Admin.News 3868, 3895; *Railroad Transportation Policy Act of 1979: Hearings Before the Committee on Commerce, Science, and Transportation on S. 1946,* 96th Cong., 1st Sess. 536, 539 (1979) (hereinafter *Hearings* ) (statement of J.R. Snyder, Chairman, Legislative Committee, RLEA and National Legislative Director, UTU) (requesting that mandatory labor protections of § 10903(b)(2) be applied to abandonment and entry provisions in S. 1946);[2] *see also RLEA v. ICC,* 784 F.2d 959, 965 (9th Cir.1986) (discussing Congress's failure to amend ICA).

Where Congress deemed labor protection necessary, it expressly provided for it. *See, e.g.,* 11 U.S.C. §§ 1170, 1172(b); 42

---

**1.** State authorities also have exclusive jurisdiction over rail carriers to the extent authorized under the ICA. 49 U.S.C. § 10501(d).

**2.** During the hearings, Mr. Snyder commented: Much of the savings to be achieved as [a] result ... will be made at the expense of the employees of the industry in terms of job abolishments and transfers. The railroad employee should be at least a partial beneficiary along with his employer of the fruits of this legislation. He must not be made its victim. *Hearings, supra* at 539.

U.S.C. §§ 10903(b)(2), 11347. Given Congress's failure to amend the ICA, it is reasonable to infer that Congress did not intend to impose mandatory labor protective conditions in other sections. *RLEA v. United States*, 791 F.2d 994, 1002 (2d Cir. 1986); *Simmons v. ICC*, 760 F.2d 126, 130 (7th Cir.1985), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986).

Until today, the judiciary has not tolerated collateral attacks on ICC-approved abandonments.[3] *See United Transp. Union v. Norfolk and Western Ry. Co.*, 822 F.2d 1114 (D.C.Cir.1987) (union RLA-based attack on arbitral award was in reality challenge to ICC order), *cert. denied*, — U.S. ——, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988); *RLEA v. Staten Island R.R. Corp.*, 792 F.2d 7 (2d Cir.1986) (ICC decision ordering sale of lines under § 10905's "forced sale" provisions could not be collaterally attacked by union's invocation of RLA procedures), *cert. denied*, — U.S. ——, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987); *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d 794 (1st Cir.) (RLA *status quo* injunction would be collateral attack on ICC's approval of § 10505 exemption from ICA of lease of lines to another railroad), *cert. denied*, — U.S. ——, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986); *Chicago & North Western Transp. Co. v. RLEA*, No. 88–444 (N.D.Ill. March 16, 1988) (applying *Staten Island* in refusing to enjoin ICC-approved sale and enjoining union strike based on finding that dispute was "minor" within RLA); *RLEA v. City of Galveston*, No. 87–359 (S.D.Tex. Nov. 4, 1987) (RLEA request for injunction based on § 6 of RLA dismissed under Fed.R.

Civ.P. 12(b)(6) because of ICC order); *United Transp. Union v. Burlington Northern R.R.*, 672 F.Supp. 1579 (D.Mont.1987) (any RLA injunction would directly interfere with ICC's grant of exemption to sale under § 10505); *Decker v. CSX Transp., Inc.*, 672 F.Supp. 674 (W.D.N.Y.1987) (complaint dismissed under Fed.R.Civ.P. 12(b)(6) because district court was unable to grant requested RLA relief without interfering with ICC order exempting railroad sale from § 10901 requirements). *See also B.F. Goodrich Co. v. Northwest Indus., Inc.*, 424 F.2d 1349, 1352–54 (3d Cir.) (ICC decision sanctioning divestiture plan could not be collaterally attacked in district court, "so long as the practical effect of a successful suit would contradict or countermand a Commission order"), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). Courts of appeals have exclusive jurisdiction over review of ICC orders. 28 U.S.C. §§ 2321, 2342. RLEA has an avenue for review of an ICC order in such a court. *See, e.g., RLEA v. United States*, 811 F.2d 1327 (9th Cir.1987) (review of ICC's denial of labor protective conditions on § 10901 sale). By "artfully wording" its pleadings, RLEA here is circumventing the avenue Congress has prescribed to appeal ICC denials of labor protective conditions. *See Kalo Brick & Tile Co.*, 450 U.S. at 324, 101 S.Ct. at 1133 (1981) ("It is difficult to escape the conclusion that the instant litigation represents little more than an attempt by a disappointed shipper to gain from [a state court] the relief it was denied by the Commission.").

The underlying reason for this RLA challenge is the ICC's repeated refusal to im-

H.R. 3332, 100th Cong., 1st Sess. (1987), currently pending before the House of Representatives Committee on Energy and Commerce, would amend the ICA to explicitly provide that the ICA does not preempt union rights under the RLA.

**3.** In *RLEA v. Pittsburgh & Lake Erie R.R.*, 831 F.2d 1231 (3d Cir.1987), we held that the district court was without jurisdiction to enjoin a labor strike under the Norris–LaGuardia Act, 29 U.S.C. §§ 101–115. Although our opinion in that case intimated that RLA dispute mechanisms should not be subordinated to the ICA, it has been cited in support of the dismissal of a union RLA-based attempt to collaterally attack an ICC exemption under § 10505. *Decker v. CSX*

*Transp., Inc.*, 672 F.Supp. 674, 678–79 (W.D.N.Y. 1987). Our opinion was distinguished in *United Transp. Union v. Burlington Northern R.R.*, 672 F.Supp. 1579 (D.Mont.1987) from an injunction of an ICC-approved sale, which would constitute a direct attack on an ICC order, as opposed to enjoining a union strike against an employer: "A strike by union members against their employer does not directly contradict or encroach upon the authority of the ICC. The authorization of the sale still stands, and at the same time the employees have the right to pressure the employer to negotiate labor protections." 672 F.Supp. at 1583 n. 3. I believe that this distinction is correct and that our earlier opinion in this case should be so construed.

pose labor protective conditions in § 10901 transactions, as evidenced by its rulemaking in *Ex Parte 392.* It strikes me as strange that the ICC has effectively denied labor protection in *all* § 10901 transactions, and that no union has ever been able to make the exceptional showing required by *Ex Parte 392. See RLEA v. Pittsburgh & Lake Erie R.R.,* 831 F.2d 1231, 1235 (3d Cir.1987). One would think that in at least an occasional case, labor could and should be given protection to insure a "fair and equitable arrangement." That protection could be given without imposing a total *status quo* obligation on the railroads and obviating the purpose and goals of the 4–R and Staggers Acts. Appropriate regulatory consideration of labor's interests would avoid the "Catch–22" of potential job destruction that full maintenance of the *status quo* entails. The perception by rail workers of ICC failure to consider labor's legitimate interests removes the middle ground and leaves us isolated at unbridgeable extremes.

Employees may well have certain vested rights which should attach to the proceeds of a sale. As labor perceives the ICC's position, they seem entitled to nothing. However, requiring exhaustion of RLA procedures leaves both employees and employers nothing, because the RLA *status quo* requirement practically guarantees the death of a near-bankrupt rail company. *See Staten Island,* 792 F.2d at 12 (since purpose of RLA is to ensure continued furnishing of railroad services to public, RLA does not authorize *status quo* if railroad can no longer provide rail service).

The RLEA's appropriate remedy in this case was appeal of the ICC's denial of labor protective conditions.[4] *See RLEA v. United States,* 811 F.2d 1327 (9th Cir.1987) (remanded to ICC to permit RLEA to petition for revocation under § 10505(d) of denial of labor protective conditions). I note that RLEA's petition for revocation, filed Octo-

ber 2, 1987, is still pending and that on October 13, 1987 the ICC ordered P & LE to maintain its corporate existence until that petition was acted upon. If the ICC denies the petition, RLEA is free to voice its complaints regarding *Ex Parte 392* to the appropriate court of appeals. In addition, the union is entitled to resort to economic self-help to gain whatever bargaining advantages it can from P & LE. *See Pittsburgh & Lake Erie R.R.,* 831 F.2d at 1237. That test of wills, which imposes penalties on both parties, seems to me more likely to concentrate their attention in the face of the demise of both jobs and rail lines than the narcotic influence of maintaining benefits hard-won in the industry's earlier, healthier days.

For these reasons, I would vacate the district court's order granting summary judgment to the union and ordering P & LE to bargain under the RLA, and remand with instructions to dismiss.

---

**4.** RLEA's argument that placing exclusive jurisdiction over labor protective conditions in the ICC amounts to an implied repealer of RLA does not adequately consider the pre–1983 history of the industry and the uniform practice of both labor and management in referring the question of labor protective conditions to the ICC in acquisitions, abandonments and consoli-

dations of service prior to passage of the 4–R and Staggers Acts. I believe the parties' long-standing practice under the statutes in question is relevant to legislative intent. What has changed is not the statute or the ICC's authority, but its policy as evidenced by *Ex Parte 392* and the attempts to get around it by using RLA § 6 procedures to attack ICC § 10505 exemptions.